963 So.2d 804 (2007)
Henry G. THORNTON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D05-1892.
District Court of Appeal of Florida, Third District.
August 1, 2007.
Rehearing Denied September 11, 2007.
*806 David S. Molansky, for appellant.
Bill McCollum, Attorney General, and Maria T. Armas, Assistant Attorney General, for appellee.
Before RAMIREZ and LAGOA, JJ., and SCHWARTZ, Senior Judge.
LAGOA, J.
After this court reversed and remanded for a new trial in Thornton v. State, 852 So.2d 911 (Fla. 3d DCA 2003)("Thornton I"), the State tried and convicted the defendant for a second time on the charges of first-degree murder and armed robbery. For the reasons set forth below, we are obliged to reverse the defendant's conviction.
I. FACTUAL HISTORY
In 1998, the defendant, Thornton, along with a co-defendant, was charged with the first-degree murder and armed robbery of Garyn Perriman. Thornton was also charged with unlawful possession of a firearm while engaged in a criminal offense and grand theft of a motor vehicle. After a jury trial, Thornton was convicted of first-degree murder and armed robbery. In Thornton I, we reversed that conviction for two reasons, one of which related to the following question asked by the prosecutor to a state witness, Luis Varnado:
Q. Did Defendant Thornton talk to you about an incident, where something he did by club V.I.P. or near club V.I.P.?
A. No.
Q. Did Mr. Thornton tell you that he had to quote unquote, "Burn a n____r near the V.I.P.?"
Id. at 911. This Court held that, among the several errors which resulted from this statement, was a violation of the rule established in Williams v. State, 110 So.2d 654 (Fla.1959). As we stated:
It is difficult to imagine a more serious violation of the rules of evidence and due process, indeed of the rule of law itself, than this statement. . . . [Because] it was not shown to be related to the crime with which Thornton was charged, the question was in simultaneous violation of several important principles of law. These include: 1. the principle of Williams v. State, 110 So.2d 654 (Fla. 1959), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), which forbids references to alleged prior unrelated offenses purportedly committed by the defendant. . . .
Thornton, 852 So.2d at 911 (footnote omitted). Thus, in Thornton I, we held that any reference to a statement made by Thornton as to any incident near or by the "V.I.P." was improper, as the statement referred to prior unrelated offenses committed by Thornton. See id.
Despite our ruling on this issue in Thornton I, the State successfully introduced testimony regarding the statement in Thornton's retrial. Over defense counsel's objection, the State relied upon the statement in its opening argument.[1] During *807 the trial, defense counsel again objected *808 to Varnado's testimony regarding the statement.[2] The State then proffered Varnado's testimony, and argued that the statement regarding the "V.I.P." was in fact a confession to the charged crime rather than a collateral crime.[3] The trial court ultimately found that the statement "related to" Perriman's murder.[4] As a result, the trial court permitted Varnado to testify regarding the statement.[5] Detective *809 Ford, the lead investigator of the crime, also testified about Thornton's statement to Varnado.[6] The State relied upon the statement in its closing argument, in which it characterized the statement as a "confession,"[7] and again in its rebuttal.[8]
II. ANALYSIS
The doctrine of the law of the case requires that "questions of law actually decided on appeal govern the case in the same court and the trial court, through all subsequent stages of the proceeding." See State v. McBride, 848 So.2d 287, 289 (Fla.2003); Florida Dep't of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001); U.S. Concrete Pipe Co. v. Bould, 437 So.2d 1061 (Fla.1983); State, Dep't of Revenue v. Bridger, 935 So.2d 536, 538 (Fla. 3d DCA 2006). This doctrine "is limited to rulings on questions of law actually presented and considered on a former appeal." U.S. Concrete, 437 So.2d at 1063; see also Juliano, 801 So.2d at 106 ("Additionally, the law of the case doctrine may foreclose subsequent consideration of issues implicitly addressed or necessarily considered by the appellate court's decision."). These rulings are then, necessarily, "except in exceptional circumstances, no longer open for discussion or consideration in subsequent proceedings in the case." Greene v. Massey, 384 So.2d 24, 28 (Fla.1980). A trial court, therefore, generally lacks discretion to change the law of the case. Bridger, 935 So.2d at 539. There are two exceptions to the confines of the doctrine: first, a trial court is not bound to follow the prior ruling if the facts upon which the prior ruling was made are no longer the facts of the case; and, second, an appellate court may reconsider and correct an erroneous ruling that has become the law of the case where a manifest injustice would result. See Juliano, 801 So.2d at 106.
In the present case, the doctrine of the law of the case precluded the trial court from finding that Thornton's alleged statement of his actions at the "V.I.P." was *810 a reference to the charged crime. In Thornton I, the State introduced the statement during the attempted impeachment of Varnado and we held that the statement was improper testimony of a collateral bad act as "it was not shown to be related to the crime with which Thornton was charged." Thornton I, 852 So.2d at 911. In the retrial, the State made the same argument that it did in Thornton I, and the trial court concluded that the testimony was admissible because it "related to this incident." Because this issue was actually presented, considered, and ruled upon by this Court in Thornton I, the trial court's ruling on this issue was error. Additionally, given the State's argument in closing that the "confession" meant that "this is not a close case," the error cannot be considered harmless. See Valley v. State, 860 So.2d 464, 469 (Fla. 4th DCA 2003).
At oral argument, in an attempt to invoke one of the exceptions to the law of the case doctrine, the State argued that the facts in the retrial were different from those in Thornton I, and the trial court therefore could consider the issue of the admissibility of the statement. Specifically, the State asserted that, unlike Thornton I, in the retrial Detective Ford testified that his investigation revealed there had been no incidents involving a shooting at or near the "V.I.P.".[9] Initially, we note that this argument was not made to the trial court and therefore not preserved. Indeed, the State did not make this argument in its answer brief, but instead first raised it at oral argument.
Even assuming that this issue was preserved, which it was not, we find unconvincing the State's argument that sufficient new facts were presented to the trial court in order to allow admission of this statement. First, Varnado  the only person with actual knowledge of Thornton's statement regarding the incident at the V.I.P.  testified that he did not understand Thornton to be referring to the crime charged in this case.[10] Moreover, Detective Ford's search in the city database covering only a three-month period is, by itself, insufficient to qualify as new facts sufficient to avoid our prior ruling. As this Court pointed out during oral argument, not every shooting is reported to the police. Consequently, Detective *811 Ford's testimony  without more  is insufficient to link Thornton's statement regarding the V.I.P. to the Perriman murder and the prior law of case remains. We therefore find that the facts established in Thornton I remained unchanged in the retrial and admission of the statement constitutes error requiring reversal.
Finally, we also write to address another issue raised by the defendant. Thornton's defense below was that of alibi and misidentification. Three eyewitnesses, Chavarri, Pender, and Davis, testified about the shooter's description. Chavarri testified that the shooter was a light-skinned, short-haired, and relatively short (approximately 5'7") black male, weighing approximately 165 pounds. During cross-examination, Detective Ford confirmed that two of the witnesses' descriptions matched that of a man whom Thornton had independently identified as the actual perpetrator of the crime.[11] When the State recalled Detective Ford to explain the process by which he ordered fingerprint cards, he also testified that he ordered fingerprints of the man whom Thornton had identified. During cross-examination, defense counsel sought to admit a photograph of the man, and the State objected contending that the photograph was irrelevant and constituted collateral evidence. Defense counsel argued that the photograph was relevant to Thornton's alibi and misidentification defense. The trial court sustained the objection, concluding that the photograph was "rooted in self-serving hearsay."[12]
The trial court erred in sustaining the State's objection to the introduction of the photograph. Absent a valid evidentiary objection, it is error for a trial court to deny the admission of evidence that tends to support the defendant's theory of the case. See Moreno v. State, 418 So.2d 1223, 1225 (Fla. 3d DCA 1982)("Where evidence tends, in any way, even indirectly, to prove a defendant's innocence, it is error to deny its admission."); see also Rivera v. State, 561 So.2d 536, 539 (Fla.1990)("[W]here evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission. . . . [T]he admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant."); Dean v. State, 916 So.2d 962 (Fla. 4th DCA 2005)(error for trial court to exclude pawn slip signed by a person using a different name than defendant and to exclude fingerprint on pawn slip not matching defendant when defendant's theory of defense was that someone else had committed the robbery); Vannier v. State, 714 So.2d 470 (Fla. 4th DCA 1998)(error for trial court to exclude letters written by the victim when defendant's theory of defense was that victim had committed suicide). In this case, the photograph was *812 relevant to Thornton's theory of defense of alibi and misidentification and the trial court should have allowed the jury to consider it as part of the full defense.
We find no merit to the remaining issues raised by Thornton. Accordingly, Thornton's conviction for first-degree murder and armed robbery is reversed, and the cause is remanded.
Reversed and remanded.
NOTES
[1] Specifically, the following exchange occurred during the State's opening:

MR. RANCK: Luis Varnado asked him, what you did? What you did? The only thing at the time that Thornton would say was the tag was messed up, there was something wrong with the tag. Well, during that same conversation on the freeway, Mr. Varnado asked Thornton, if he wanted to go to the VIP club, which is a strip joint up on 79th street and 7th Avenue and Thornton said, no I can't go  I can't go over there. I can't go over. Why? What did you do?
MR. BLOOM: Objection.
THE COURT: Sustained.
MR. BLOOM: Can we have a sidebar?
THE COURT: Yes.
(Thereupon, a sidebar discussion was had as follows:)
MR. BLOOM: I don't want to anticipate what Mr. Ranck is going to say or do, but anything with regard to the VIP is 404 evidence. It's not part of this case. That's what caused the last trial to be reversed was the conversation about the VIP. I don't know where you're going, but . . .
MR. RANCK: Maybe I missed the evidentiary ruling but the "burn a n____a" statement is not coming out.
MR. BLOOM: It's anything about the VIP that's what . . .
MR. RANCK: That's what the argument was that you argued in the motion. I didn't say someone was shot at the VIP, it's our contention that this is the murder.
MR. BLOOM: Our position is that that's referencing another bad act, and it's 404 B(2). It's also highly prejudicial to let the jury hear that Thornton may have committed another act and it clearly hasn't been noticed.
THE COURT: But we're on two different pages here. The State is not saying this is another act. The State is saying that this is the act here and the charge for that, was my understanding that I had when we had the motion. That was the impression I had from the State.
They were trying to get it out last time, as inartfully as they did, but they were talking about one and the same event. Left up to argument is to determine whether or not he was talking about the VIP or whether or not 69th Street is close enough to 79th Street and 2nd Avenue, close to 7th Avenue but . . .
MR. BLOOM: But the VIP or any reference to the involvement at the VIP is irrelevant to this crime and it violates 403, whatever probative value is greatly outweighed 
THE COURT: That's not what the State is doing. The State is trying to pin that location to this event.
MR. RANCK: I'm saying Thornton was telling him about this murder, not another murder.
MR. BLOOM: Telling him about this murder?
MR. RANK: About this murder. About this murder. He refers to the location generally as over there by the VIP which is twenty-three minutes away and which they both knew that was a strip club and was a landmark. He could have said over by the Baptist church but he didn't frequent there.
MR. BLOOM: I still maintain my objection. It's 404 and it's highly prejudicial. Anything that happened at the VIP by innuendo is a suggestion that he admitted to the Perriman murder and in Varnado's statement there's no reference made to the Perriman murder. That's what the evidence has got to be.
MR. RANCK: I disagree. You can certainly argue that, and I put this in writing, in addition to the rules of argument, it's absolutely clear that what he's talking about is the Perriman murder. He's referring to what happened over by the VIP. It's clear to me that's what this is, not another bad act; it's this act.
MR. BLOOM: I made [m]y objection.
(Thereupon, the sidebar discussion was concluded, and the following proceedings were had:)
THE COURT: The objection is overruled. (The State continues with its Opening)
MR. RANCK: In this car ride, when Thornton says, if they're going to stop me, I'm going to flee, he makes the statement also later, I shot somebody over by the VIP. I shot somebody over by the VIP. The VIP is a strip joint located at 79th and 7th. This murder happened at 67th and 2nd. A couple of minutes away by car. They were familiar with the VIP. That was their landmark for that area. Thornton didn't say I shot somebody inside the VIP or I shot a dancer. I shot somebody by the VIP. I can't go in that area.
Once Luis Varnado realizes that it's not the tag that's messed up, but it's a life that's messed up and that he's in the car with the guy who just confessed to him about this, he tells him, takes me home. Get me out of this car. And that's what Thornton does.
[2] Specifically, defense counsel argued as follows:

MR. BLOOM: If we're going to do Varnado, I'm going to ask the Court for an oral motion in limine to conduct a hearing as to what Mr. Varnado is going to testify to.
MR. RANCK: I don't have a problem with that.
MR. BLOOM: This is what got us  well, not us, we had different players. It's my clear understanding, based upon reading Varnado's statement in April of 1998, his testimony before Judge Platzer in 2000 and his deposition that he gave Mr. Ranck and me, that there's no connection between the VIP incident and the Perriman murder. Whatever Mr. Thornton may have told him is totally unrelated and that's what I think he testifies to.
If we get into a situation where Mr. Ranck is going to put on him on [sic] and he's going to talk abut the VIP, and the VIP is not related, it's a violation of 404 and totally irrelevant and highly prejudicial and at least grounds for a mistrial.
[3] During the proffer, Varnado testified on the stand during cross-examination as follows:

Q. Do you know anything about the incident that occurred at the VIP that you and Mr. Thornton were talking about in the car?
A. Do I know what occurred out there?
Q. Yes.
A. No, I don't. All I remember him saying he had got into something with somebody over there.
Q. At the VIP?
A. Yeah.
Q. Now was he talking at the VIP or was he talking about in the general area over by the VIP, or the just the general neighborhood?
A. From my understand, at the VIP.
Q. The incident that you and he were talking about in the car ride occurred at the specific location of the VIP?
A. Yeah.
Q. Now in the car ride, did Mr. Thornton ever say anything to you that would lead you to believe that he was in involved in the Perriman murder that took place at 67th Street and N.W. 2nd Avenue?
A. No.
Q. In your mind is the VIP a distinct location and a distinct incident from the Perriman murder?
A. Say that again.
Q. In your mind is the VIP a distinct location and a distinct incident  separate location and separate incident from the Perriman murder?
A. Yeah.
Q. The two are not the same, are they?
A. No.
[4] Specifically, the trial court stated:

THE COURT: Okay. All right. The Court finds it isn't evidence [of] other uncharged crimes or other like crimes like William's Rule evidence. That it is related to this incident. The State will be able to get into that.
[5] Specifically, Varnado testified as follows:

Q. In the car ride did Mr. Thornton tell you why he did not want to go to the strip club that day?
MR. BLOOM: Objection. Preserve the arguments that have previously been made.
THE COURT: Overruled.
BY MR. RANCK:
Q. You can answer.
A. Yes.
Q. What did he say?
A. That he had gotten into something with somebody, that he had shot somebody or something.
* * *
Q. Did you ask him or did he say anything about why he wasn't going to stop if the police tried to stop him?
A. He said the tag wasn't any good.
Q. Later on in the conversation, you mentioned earlier about this comment that he made about over at the VIP. Later on in the conversation did he tell you about something more serious that he had done besides having the tag messed up?
A. He said he shot somebody and that's why he can't go by the VIP.
[6] Specifically, Detective Ford testified as follows:

Q. And without getting into hearsay, he told you about a car ride he had with Mr. Thornton, correct?
A. Yes, he did.
Q. And statements that were made, right?
A. That's correct.
Q. I'd like to ask you if in that statement, do you recall and this is just for state of mind, not for the truth of the matter, do you recall Mr. Varnado telling you about Thornton telling him that he had to shoot somebody over by the VIP?
MR. BLOOM: Objection, this is hearsay contained in the question which is leading.
THE COURT: Overruled.
A. Yes, sir, he did.
* * *
Q. Were you asking him about any other crime regardless of if it was a shooting or not that Henry Thornton had committed besides the Perriman homicide, in that statement?
A. No, sir.
[7] Specifically, the State argued:

When you have a statement, a confession, a confession to the crime, not made to a police officer, which you will can imagine or from your experiences or from living in Miami, you know did something wrong, but a confession to a friend of his, I shot somebody. I can't go over to the VIP to Luis Varnado. When you have something like, this is not a close case.
[8] Specifically, the State argued:

Finally, the VIP is this case. It is not  there's is [sic] no other shooting that happened at the VIP. There's no other shooting that I have charged or the State Attorney's Office has charged. It's that case. He didn't say it's one if [sic] the dancers inside by the pole over there. He said, over by the VIP. I don't want to go over by the VIP. This is five minutes away by car. That was Ford's testimony; five minutes away by car. That was this or [sic] case; I had to shoot somebody over by the VIP.
[9] During re-direct examination, Detective Ford testified as follows:

Q. Have you done investigation since the year 2000 to determine if it there was any other shooting that was at the VIP or near the VIP in that general area?
A. Yes, sir.
Q. Was there any?
A. No, sir.
During re-cross examination, Detective Ford testified as follows:
Q. When you say you investigated to determine if there were any shootings there, did you write a report of your investigation?
A. No, I researched whether or not there had been any shootings during that time period.
Q. What time period were you researching?
A. The early part of '98 between April and May.
Q. So you researched the period of two months between 
A. March, April and May. That would be three months.
Q. Three months. Did you write a report reflecting that research?
A. You can just get the computer printout. We have a data base that will tell us if there was a shooting at the club or near there.
Q. And that's both the city and the county?
A. Just the city.
Q. So you didn't research the county printout?
A. No, sir.
Q. And you only did it for a period of three months?
A. Correct.
[10] See supra note 3.
[11] During Detective Ford's direct and redirect examination, he testified that Thornton told him he had lent his car to his cousin and that his cousin in turn had lent the car to the actual perpetrator of the shooting. Ford testified regarding his investigation of this alibi and the alleged perpetrator. The State offered to produce taped phone calls between Thornton and his cousin, in which Thornton asked his cousin to admit that the other man shot the victim. Ultimately, the tape was not introduced, but Detective Ford recounted the conversations.
[12] The trial court's exclusion of the photograph was apparently based upon the fact that Thornton himself was the person who gave the name of the person in the photograph to Detective Ford. We need not determine whether or not the trial court's conclusion was correct because the State did not object to the evidence upon which the photograph was allegedly "rooted." In fact, much of the testimony concerning the investigation of the man in the photograph was presented by the State through Detective Ford.