561 So.2d 536 (1990)
Michael T. RIVERA, Appellant,
v.
STATE of Florida, Appellee.
No. 70563.
Supreme Court of Florida.
April 19, 1990.
Rehearing Denied June 22, 1990.
H. Dohn William, Jr., Sp. Public Defender, Fort Lauderdale, for appellant.
Robert A. Butterworth, Atty. Gen., and Joan Fowler, Asst. Atty. Gen., West Palm Beach, for appellee.
*537 BARKETT, Justice.
Michael T. Rivera appeals his conviction for first-degree murder and the sentence of death.[1] We affirm both the conviction and sentence.
Eleven-year-old Staci Lynn Jazvac left her Lauderdale Lakes home on bicycle at about 5:30 p.m. on January 30, 1986, to purchase poster board at a nearby shopping center. A cashier recalled having sold her a poster board between 6:30 and 7:00 p.m. When Staci failed to return by dusk, her mother began to search. At about 7:30 p.m. the mother encountered a Broward County Deputy Sheriff, who had Staci's bicycle in the trunk of his car. The deputy found the bicycle abandoned in a field alongside the shopping center. A police investigation ensued.
Police first connected Michael Rivera to Staci's murder through a complaint filed by Starr Peck, a Pompano Beach resident. She testified that she had received approximately thirty telephone calls during September 1985 from a man who identified himself as "Tony." He would discuss his sexual fantasies and describe the women's clothing he wore, such as pantyhose and one-piece body suit. She received the last telephone call from "Tony" after Staci's murder. Ms. Peck testified that he said he had "done something very terrible... . I'm sure you've heard about the girl Staci... . I killed her and I didn't mean to... . I had a notion to go out and expose myself. I saw this girl getting off her bike and I went up behind her." She testified that he had admitted putting ether over Staci and dragging her into the back of the van where he sexually assaulted her. Rivera had been employed by Starr Peck, and she identified him as "Tony."
On February 13, Detectives Richard Scheff and Phillip Amabile of the Broward County Sheriff's Department took Rivera into custody on unrelated outstanding warrants and transported him to headquarters where they told him that they wanted to speak to him. Detective Scheff testified that Rivera responded, "If I talk to you guys, I'll spend the next 20 years in jail." After reading Rivera his Miranda rights,[2] Detective Scheff told Rivera that someone had advised them that Rivera had information about the disappearance of Staci Jazvac. The detective testified that Rivera admitted making the obscene phone calls to Starr Peck but denied having abducted or murdered Staci.
In subsequent interviews, Rivera admitted that he liked exposing himself to girls between ten and twenty years of age. He preferred the Coral Springs area because its open fields reduced the likelihood of getting caught. He would often borrow a friend's van and commented that "every time I get in a vehicle, I do something terrible." Rivera then admitted to two incidents. In one, he said he had exposed himself to a girl pushing a bike. When asked what he did with her, Rivera replied: "Tom, I can't tell you. I don't want to go to jail. They'll kill me for what I've done." In the other, he said he had grabbed another young girl and pulled her into some bushes near a Coral Springs apartment complex.
Staci's body was discovered on February 14 in an open field in the city of Coral Springs, several miles from the site of the abduction. Dr. Ronald Keith Wright, a forensic pathologist, testified that most of the upper part of the body had decomposed and that the body was undergoing early skeletonization. The doctor concluded that death was a homicide caused by asphyxiation, which he attributed to ether or choking.
Dr. Wright observed that the body was completely clothed, although the jeans were unzipped and partially pulled down about the hips, and the panties were partially torn. Dr. Wright opined that this could be the result of the expansion of gasses during decomposition and not sexual molestation. He was unable to determine whether she was sexually assaulted. He discovered a bruise on the middle of the forehead that occurred before death, but he *538 could not testify with certainty as to the cause. He also observed a broken finger-nail on her right hand index finger, which he could not interpret as evidence of a struggle. Dr. Wright believed that the body was carried to the field and dumped, and at that time Staci was either dead or unconscious.
The jury heard testimony from several of Rivera's fellow inmates. Frank Zuccarello testified that Rivera admitted that he had choked another child, Jennifer Goetz, in the same way he had choked Staci; that Rivera said he had tried to kill Jennifer but was frightened away; and that Rivera said he had taken Staci to the field where she screamed and resisted, and he choked her to death after things got out of hand. Rivera also admitted that he told Starr Peck that he had murdered Staci, saying that confiding in her was the biggest mistake of his life. William Moyer testified that Rivera had stated to him: "You know, Bill, I didn't do it, but Tony did it." He later overheard Rivera call Starr Peck and identify himself as "Tony." Peter Salerno testified that Rivera told him: "I didn't mean to kill the little Staci girl. I just wanted to look at her and play with her."
A manager of a Plantation restaurant testified that he had received over two hundred telephone calls during a two-year period from an anonymous male caller. On February 7, the Friday before Staci's body was discovered, the caller identified himself as "Tony" and said that he "had that Staci girl" while wearing pantyhose, and that he had put an ether rag over her face.
The jury returned a verdict of guilty as charged.
During the penalty phase, the state introduced evidence of prior convictions.[3] Rivera introduced the testimony of his sisters, Elisa and Miriam, through whom the jury learned that Rivera was himself the victim of child molestation. Rivera's present girlfriend testified that she had no concerns about leaving him with her children. Rivera's former girlfriend was allowed to testify under an alias. She expressed the opinion that Rivera had two personalities. Through Michael he demonstrated a good side and through "Tony" he exposed his dark side which compelled him to do terrible things.
Dr. Patsy Ceros-Livingston, a clinical psychologist, interviewed Rivera in jail. She diagnosed Rivera as having a borderline personality disorder, which is characterized by impulsivity, a pattern of unstable and intense interpersonal relationships, lack of control of anger, identity disturbance, affective instability, intolerance of being alone, and physically self-damaging acts. The doctor also diagnosed exhibitionism, voyeurism, and transvestism.
Dr. Ceros-Livingston opined that Rivera acted under extreme duress and that he had some special compulsive characteristics that substantially impaired his capacity to appreciate the criminality of his conduct or to conform this conduct to the requirement of the law.
The jury unanimously recommended the death penalty. The trial judge found four aggravating circumstances,[4] one statutory mitigating circumstance,[5] and no nonstatutory mitigating circumstances.
Rivera claims that two trial court errors in the guilt phase of his trial mandate reversal. First, Rivera contends that the introduction of evidence in the state's case-in-chief regarding the sexual assault *539 upon Jennifer Goetz violated the rule of Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), and the Florida Evidence Code.[6]
In this case, the material issue to be resolved by the similar fact evidence was identity. Rivera relies upon Drake v. State, 400 So.2d 1217 (Fla. 1981), and argues that the similarities between the two crimes were not of a "special character" or "so unusual" as to point to him. We reject that argument and find Drake distinguishable. There the only similarity between the two crimes was that the two victims had their hands tied behind their backs and left a bar with the defendant. Id. at 1219.
Here, there were numerous similarities between the two crimes. Both victims were eleven years of age, caucasian, with blond hair. Both were similar in stature, small and petite. Both were alone and approached from behind. Both abductions occurred during daylight, and within four miles of Rivera's home. After each crime, individuals received phone calls from a man who identified himself as "Tony" and who stated that he was wearing pantyhose and leotards and had fantasized about raping young girls.[7]
We find that the similarities between the two crimes establish "a sufficiently unique pattern of criminal activity" to justify the admission of collateral crime evidence on the disputed, material issue of identity. Chandler v. State, 442 So.2d 171, 173 (Fla. 1983). Moreover, we do not find that the evidence of this crime became a major feature of the trial. Burr v. State, 466 So.2d 1051, 1053 (Fla.), cert. denied, 474 U.S. 879, 106 S.Ct. 201, 88 L.Ed.2d 170 (1985).
Second, Rivera contends that the trial court improperly excluded "reverse" Williams rule evidence. Through proffered testimony, Rivera attempted to establish that a crime of a similar nature had been committed by another person.
Although the question of the admissibility of "reverse Williams Rule" evidence by a defendant appears to be one of first impression for this Court, the Third District in Moreno v. State, 418 So.2d 1223, 1225 (Fla. 3d DCA 1982), has permitted it on the basis that an accused may show his or her innocence by proof of the guilt of another. That view has been adopted by the First District in Brown v. State, 513 So.2d 213, 215 (Fla. 1st DCA 1987), dismissed, 520 So.2d 583 (Fla. 1988):
While most cases generally involve the offer of similar fact evidence by the prosecution against a defendant in a criminal case, there is nothing in the language of [section 90.404(2)(a), Florida Statutes (1985)] which precludes the use of evidence offered by a defendant in a criminal case, or by a party in a civil action. See C. Ehrhardt, Florida Evidence § 404.9 (2d ed. 1984).
(Footnote omitted.)
Other jurisdictions also have held that defendants may introduce similar fact evidence. See, e.g., Commonwealth v. Keizer, 377 Mass. 264, 385 N.E.2d 1001 (1979) (reaffirming Commonwealth v. Murphy, 282 Mass. 593, 185 N.E. 486 (1933)); State v. Bock, 229 Minn. 449, 39 N.W.2d 887 (1949); State v. Garfole, 76 N.J. 445, 388 A.2d 587 (1978).
We agree with the Third District Court in Moreno that where evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission. § 90.404(2)(a), Fla. Stat. (1985). However, the admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant.
*540 In this case, Rivera sought to introduce evidence pertaining to the February 20 abduction and murder of Linda Kalitan, which occurred while Rivera was in custody. We find the dissimilarity of this crime to Staci Jazvac's murder sufficient to preclude its admissibility as relevant evidence. Linda Kalitan was twenty-nine years of age, whereas Staci was eleven. Her body was fully developed, whereas Staci's body was childlike. Linda's body was totally nude except for a pair of socks, whereas Staci was clothed. Linda's body was found in a canal and her clothing was weighted down by rocks. Although both bodies were found in the same general location, Staci was found in the vacant field. In Linda's case, there was evidence of anal sex prior to her death, unlike Staci's case. Staci was abducted in northern Broward County, and Linda was abducted in southwest Broward County.
The only alleged similarities were that both Staci and Linda were riding bicycles when they were abducted; they were both asphyxiated;[8] their bodies were found in the same general area; and pantyhose was discovered in the vicinity of their bodies.[9] Under these circumstances, we find that the trial court did not abuse its discretion in excluding the proffered evidence.
Finally, Rivera contends that the death penalty is disproportionate. Rivera concedes that there is a basis in the record for finding the existence of two aggravating factors,[10] but contends that the two other factors found by the trial court were unsupported by the record. First, Rivera disputes the finding that the murder was especially heinous, atrocious, or cruel. We find that the record conclusively supports the trial court's finding of this factor beyond a reasonable doubt. Testimony established that Rivera abducted Staci and took her to a field where he sexually assaulted her. The testimony indicated that Staci screamed and resisted Rivera until he was able to kill her by asphyxiation. We have found that "fear and emotional strain preceding a victim's almost instantaneous death may be considered as contributing to the heinous nature of the capital felony." Adams v. State, 412 So.2d 850, 857 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). We find sufficient evidence to support the finding that this murder was especially heinous, atrocious, or cruel.
Second, Rivera argues that the murder was not cold, calculated, and premeditated. Although Deputy Scheff testified that Rivera had admitted fantasizing about raping young girls and prowled neighborhoods in search of a victim, there was no evidence of any prior intent to kill. Indeed, the only evidence on that question was to the contrary. For instance, witnesses testified that Rivera stated that he "didn't mean to kill the Staci girl," he "just wanted to look at her and play with her"; he "had a notion to go out and expose [himself]"; and he choked her to death only after things got out of hand. The murder resulted only after the crime had escalated beyond its intended purpose. The record does not support the finding of the heightened premeditation necessary to prove this aggravating factor beyond a reasonable doubt.
Finally, we find no merit to Rivera's claim that the trial court erred in failing to find that Rivera acted under extreme duress or under substantial domination of another, or that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. The trial court did find that Rivera was under the influence of an extreme mental or emotional disturbance. We conclude on this record that the *541 trial court was acting within the parameters of its discretion in rejecting the additional mitigating factors. The trial court's findings with regard to the existence or nonexistence of mitigating circumstances are supported by substantial competent evidence. Bryan v. State, 533 So.2d 744, 749 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1765, 104 L.Ed.2d 200 (1989).
We are left with three aggravating circumstances, which include previous convictions of violent crimes and a finding that this murder was heinous, atrocious, and cruel. On this record, we are persuaded that the one mitigating factor weighed against the magnitude of the aggravating factors would render the same result in the trial court below, absent the single invalidated aggravating circumstance.
For these reasons, we affirm the conviction and imposition of the death penalty.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Our jurisdiction is mandatory. Art. V, § 3(b)(1), Fla. Const.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] On November 6, 1986, Rivera was convicted of attempted first-degree murder, kidnapping, aggravated child abuse, and aggravated battery. The state conceded that those crimes were on appeal. However, there were other felonies involving the use or threat of violence of which Rivera stood convicted and which were not on appeal. They include the October 1980 crimes of burglary with intent to commit battery and of indecent assault on a female child under the age of fourteen.
[4] § 921.141(5)(b), (d), (h), (i), Fla. Stat. (1985) (previous conviction of felony involving the threat or use of violence; murder committed during the commission of an enumerated felony; murder especially heinous, atrocious, or cruel; and murder committed in a cold, calculated, and premeditated manner).
[5] § 921.141(6)(b), Fla. Stat. (1985) (defendant under the influence of extreme mental or emotional disturbance).
[6] Rivera asserts that the following section of the Code was violated:

Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but is inadmissible when the evidence is relevant solely to prove bad character or propensity.
§ 90.404(2)(a), Fla. Stat. (1985).
[7] A search of Rivera's residence produced items of female clothing from under Rivera's bed and between the mattress, including pantyhose.
[8] Although it was clear in Linda Kalitan's case that she was choked, in Staci's case the medical examiner was not able to tell if the asphyxiation was caused by ether or strangulation.
[9] A pair of soiled and weathered pantyhose was found approximately 300 yards from the location where Linda's body was discovered. Among the items collected in the area where Staci's body was discovered were eight pair of pantyhose and thirteen packages of pantyhose.
[10] Those circumstances are conviction for a previous felony and murder committed while engaged in an enumerated felony.