# Supreme Court of Florida

_____

No. SC13-1077
_____

**MICHAEL T. RIVERA,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 25, 2015]

PER CURIAM.

This case is before the Court on appeal from an order denying a successive motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

## BACKGROUND

Michael T. Rivera was convicted and sentenced to death for the first-degree murder of Staci Lynn Jazvac. Rivera v. State (Rivera I), 561 So. 2d 536, 537 (Fla. 1990). In the opinion affirming the conviction and sentence, this Court detailed the facts of the murder:

Eleven-year-old Staci Lynn Jazvac left her Lauderdale Lakes home on bicycle at about 5:30 p.m. on January 30, 1986, to purchase poster board at a nearby shopping center. A cashier recalled having sold her a poster board between 6:30 and 7:00 p.m. When Staci failed to return by dusk, her mother began to search. At about 7:30 p.m. the mother encountered a Broward County Deputy Sheriff, who had Staci's bicycle in the trunk of his car. The deputy found the bicycle abandoned in a field alongside the shopping center. A police investigation ensued.

Police first connected Michael Rivera to Staci's murder through a complaint filed by Starr Peck, a Pompano Beach resident. She testified that she had received approximately thirty telephone calls during September 1985 from a man who identified himself as "Tony." He would discuss his sexual fantasies and describe the women's clothing he wore, such as pantyhose and [a] one-piece body suit. She received the last telephone call from "Tony" after Staci's murder. Ms. Peck testified that he said he had "done something very terrible. . . . I'm sure you've heard about the girl Staci. . . . I killed her and I didn't mean to. . . . I had a notion to go out and expose myself. I saw this girl getting off her bike and I went up behind her." She testified that he had admitted putting ether over Staci and dragging her into the back of the van where he sexually assaulted her. Rivera had been employed by Starr Peck, and she identified him as "Tony."

On February 13, Detectives Richard Scheff and Phillip Amabile of the Broward County Sheriff's Department took Rivera into custody on unrelated outstanding warrants and transported him to headquarters where they told him that they wanted to speak to him. Detective Scheff testified that Rivera responded, "If I talk to you guys, I'll spend the next 20 years in jail." After reading Rivera his Miranda rights, [n.2] Detective Scheff told Rivera that someone had advised them that Rivera had information about the disappearance of Staci Jazvac. The detective testified that Rivera admitted making the obscene phone calls to Starr Peck but denied having abducted or murdered Staci.

[N.2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1206, 16 L. Ed. 2d 694 (1966).

In subsequent interviews, Rivera admitted that he liked exposing himself to girls between ten and twenty years of age. He preferred the Coral Springs area because its open fields reduced the

likelihood of getting caught. He would often borrow a friend's van and commented that "every time I get in a vehicle, I do something terrible." Rivera then admitted to two incidents. In one, he said he had exposed himself to a girl pushing a bike. When asked what he did with her, Rivera replied: "Tom, I can't tell you. I don't want to go to jail. They'll kill me for what I've done." In the other, he said he had grabbed another young girl and pulled her into some bushes near a Coral Springs apartment complex.

Staci's body was discovered on February 14 in an open field in the city of Coral Springs, several miles from the site of the abduction. Dr. Ronald Keith Wright, a forensic pathologist, testified that most of the upper part of the body had decomposed and that the body was undergoing early skeletonization. The doctor concluded that death was a homicide caused by asphyxiation, which he attributed to ether or choking.

. . . .

The jury heard testimony from several of Rivera's fellow inmates. Frank Zuccarello testified that Rivera admitted that he had choked another child . . . in the same way he had choked Staci; that Rivera said he had tried to kill [that other child] but was frightened away; and that Rivera said he had taken Staci to the field where she screamed and resisted, and he choked her to death after things got out of hand. Rivera also admitted that he told Starr Peck that he had murdered Staci, saying that confiding in her was the biggest mistake of his life. William Moyer testified that Rivera had stated to him: "You know, Bill, I didn't do it, but Tony did it." He later overheard Rivera call Starr Peck and identify himself as "Tony." Peter Salerno testified that Rivera told him: "I didn't mean to kill the little Staci girl. I just wanted to look at her and play with her."

A manager of a Plantation restaurant testified that he had received over two hundred telephone calls during a two-year period from an anonymous male caller. On February 7, the Friday before Staci's body was discovered, the caller identified himself as "Tony" and said that he "had that Staci girl" while wearing pantyhose, and that he had put an ether rag over her face.

Id. at 537-38. The jury recommended a death sentence by unanimous vote. Id. at

538. In support of the death penalty, the trial court found four aggravating

circumstances: (1) Rivera had previously been convicted of a felony involving the threat or use of violence; (2) the murder was committed during the commission of a felony; (3) the murder was especially heinous, atrocious, or cruel (HAC); and (4) the murder was committed in a cold, calculated, and premeditated manner (CCP). Id. at n.4. The trial court found one statutory mitigating circumstance was established, that Rivera was under the influence of an extreme mental or emotional disturbance, and found no nonstatutory mitigating circumstances.[1] Id. at n.5.

Rivera raised four claims on direct appeal: (1) the introduction of similar fact evidence regarding a sexual assault on another girl violated both Williams v. State, 110 So. 2d 654 (Fla. 1959), and the Florida Evidence Code; (2) the trial court improperly excluded "reverse" Williams rule evidence that the crime had been committed by another person; (3) the death penalty was disproportionate because the HAC and CCP aggravating factors were not supported by the record; and (4) the trial court erred when it failed to find that Rivera acted under extreme duress or under the substantial domination of another, or that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. Rivera, 561 So. 2d at 538-41.

---

1. Rivera's trial preceded this Court's decision in Campbell v. State, 571 So. 2d 415 (Fla. 1990).

This Court struck the CCP aggravating factor, but affirmed the conviction and sentence. Id. at 541.

In the initial postconviction motion, Rivera presented twenty claims. Rivera v. State (Rivera II), 717 So. 2d 477, 480 (Fla. 1998). The claims were:

> (1) whether Rivera was denied due process, a full and fair hearing, and an impartial tribunal on his motion to vacate; (2) whether due process was violated by the exclusion of evidence which may have gone to reasonable doubt; (3) whether Rivera was denied effective assistance of counsel due to counsel's failure to raise a prejudicial pre-indictment delay issue; (4) whether counsel's performance was deficient in not presenting certain evidence during the penalty and sentencing phases; (5) whether counsel's performance was deficient in not presenting a voluntary intoxication defense; (6) whether Rivera was sentenced to death in violation of the eighth amendment; (7) whether Rivera's sentence of death rests upon an unconstitutional aggravator; (8) whether Rivera was denied his right to a fair and impartial jury; (9) whether the trial court's rulings cumulatively denied Rivera a fair trial; (10) whether Rivera was denied effective assistance of counsel during the guilt phase; (11) whether counsel was ineffective in failing to [e]nsure that the penalty phase jury received accurate instructions; (12) whether the eighth amendment was violated by the trial court's refusal to consider mitigating circumstances set out in the record; (13) whether counsel was ineffective in not objecting to the penalty phase jury instructions; (14) whether due process was denied when the court relied on facts not of record in sentencing Rivera; (15) whether the trial court unconstitutionally burdened Rivera in establishing mitigators beyond a reasonable doubt; (16) whether Rivera's penalty phase jury received instructions guiding and channeling its sentencing discretion; (17) whether counsel's failure to object to misleading evidence was ineffective assistance of counsel; (18) whether the procedure whereby appointed counsel is selected and funded in Broward County creates an irreconcilable conflict of interest; (19) whether the State's introduction of Williams rule evidence is reversible error since two convictions were reversed on appeal; and (20) whether the trial court's cumulative errors denied Rivera a fair trial.

- 5 -

Id. at 480 n.1.  The Court affirmed the denial of all twenty claims except the summarily denied claim that Rivera's counsel was ineffective for failing to adequately investigate and prepare for the penalty phase, which the Court remanded for an evidentiary hearing.  Id. at 484, 487.  After an evidentiary hearing, the trial court denied relief, and this Court affirmed.  Rivera v. State (Rivera III), 859 So. 2d 495, 512 (Fla. 2003).  The Court also denied habeas corpus relief.  Id.

On October 1, 1999, Rivera filed a successive rule 3.850 motion.  Rivera v. State (Rivera IV), 995 So. 2d 191, 193 (Fla. 2008).[2]  Rivera amended the motion in 2001 and again in 2004.  Id.  The amended motion raised the following claims:

> (1) Rivera was deprived of due process under Giglio[ v. United States, 405 U.S. 150 (1972),] when the prosecution intentionally permitted false or misleading evidence to be presented to Rivera's jury and used to obtain a conviction; (2) Rivera was deprived of his right to due process and other constitutional rights under Brady[ v. Maryland, 373 U.S. 83 (1963),] because the State failed to disclose evidence which was material and exculpatory in nature or presented misleading evidence, or defense counsel unreasonably failed to discover and present exculpatory evidence, or new evidence establishes manifest injustice; (3) Rivera was denied a fair trial and postconviction proceedings due to the trial judge's bias and predetermination of the issues; and (4) the results of DNA testing constitute newly discovered

---

2. The successive motion was filed while the remand on the ineffective assistance of penalty phase counsel claim was pending before the trial court. Rivera IV, 995 So. 2d at 193.  When the denial of the ineffective assistance claim was appealed, this Court ordered the trial court to consider the successive postconviction motion pursuant to the criminal rules in effect prior to October 1, 2001.  Id.

- 6 -

exculpatory evidence that, when considered with other evidence, establishes Rivera's entitlement to a new trial.

Id. After a Huff[3] hearing, the trial court summarily denied all claims. Id. This Court affirmed the denial of the third claim, but remanded for an evidentiary hearing on the Giglio/Brady ineffective assistance and newly discovered evidence claims. Id. at 194, 197-98. This is the appeal from the denial of these claims following an evidentiary hearing.

## Claims

With respect to the newly discovered DNA evidence claim, several hairs were collected from Staci's body and from a van that belonged to Mark Peters, which the State argued during trial was used by Rivera to abduct Staci. During trial, the State presented a hair comparison expert who testified that a hair found in Peters's van was similar to the known hair of Staci. However, the DNA analysis performed on that hair in 2003 revealed that it did not match the known DNA profile of Staci.[4] Rivera alleged in his amended successive postconviction motion

---

3. Huff v. State, 622 So. 2d 982 (Fla. 1993).

4. Ten hairs were provided to the DNA laboratory, as well as the known hairs of Staci and Rivera. Rivera does not raise any claims with respect to the remaining hairs that were analyzed for DNA comparison. Two of the hairs provided to the laboratory were collected from Peters's van, one of which is the basis of Rivera's claim. The second hair also did not match the DNA profile of Staci. The eight remaining hairs were collected from Staci's body. Three were described as originating from "white top," two of which were from the same donor. Staci and her maternal relatives could not be excluded as potential donors of these

that this newly discovered evidence, when considered in conjunction with all other exculpatory evidence, entitled Rivera to a new trial.

In the Giglio claim, Rivera alleged that the State intentionally permitted Frank Zuccarello, a jailhouse snitch, to present false and misleading testimony that he was not offered a deal by the State in exchange for his testimony against Rivera. In support of this claim, Rivera attached to his successive motion the following documents: (1) a plea offer extended by the State to Zuccarello, (2) four Broward County Jail "prisoner receipts" dated between April and July 1986 releasing Zuccarello into the custody of various law enforcement officers, and (3) two documents that refer to Zuccarello as a confidential informant (CI).

In his Brady/ineffective assistance claim, Rivera alleged that the State withheld the above evidence. Rivera also alleged that the State withheld: (1) two reports that indicated two separate interviewers believed Zuccarello repeatedly lied during polygraph examinations with respect to the murder of Stanley Cohen;[5] and

two hairs. The third "white top" hair was significantly degraded and provided a partial profile that also could not exclude Staci or her maternal relatives. With regard to Rivera, the results for this hair were inconclusive. Five hairs were described as originating from "left shoe," and both Rivera and Staci were excluded as possible donors.

5. Joyce Cohen, Stanley Cohen's wife, was convicted for his murder. See Cohen v. State, 581 So. 2d 926 (Fla. 3d DCA 1991); see also Caracciolo v. McDonough, 456 F. Supp. 2d 1240 (S.D. Fla. 2006). Before she was convicted, Zuccarello informed law enforcement that he and two others were hired by Joyce Cohen to murder her husband.

(2) a memo from the Dade County Jail in which a corporal stated that Zuccarello routinely misbehaved and would not be punished because the State Attorney's Office would intercede on his behalf, along with incident reports documenting such misbehavior. Rivera also alleged that newspaper articles published in 1998 indicated that Zuccarello testified in numerous cases, and his testimony in at least two murder cases, including the Cohen homicide, was false. Rivera contended that had he known the extent of Zuccarello's involvement with police, he could have impeached Zuccarello's testimony, would have scrutinized Zuccarello's records to discover further impeachment evidence, and could have discovered whether Zuccarello was acting as an agent for the State.

Rivera also alleged that his initial postconviction counsel exercised due diligence with regard to these claims. The initial postconviction proceedings conducted before the circuit court occurred from approximately 1991-1995.[6] At the time, the records repository had not yet been established. During the majority of his initial postconviction proceedings, Rivera was represented by Judith Dougherty and Haroun Shabazz. Dougherty was replaced by Scott Braden in December 1994. Rivera's amended initial postconviction motion was filed on

---

6. The final amended postconviction motion was filed in 1995, and the evidentiary hearing for the motion was held in 1995. This Court issued its opinion in Rivera II in 1998, in which it remanded the case on the issue of effectiveness of penalty phase counsel. The opinion in Rivera III was issued in 2003.

- 9 -

January 3, 1995. With respect to the successive postconviction motion, it was initially filed on October 1, 1999, at which time Rivera was represented by Melissa Donohoe and Suzanne Keffer. Martin McClain, Rivera's current counsel, replaced Donohoe as first chair in approximately the fall of 2001, and Keffer remained as second chair.

Evidentiary Hearing

During the evidentiary hearing, Rivera presented the testimony of Keffer, Braden, and McClain. He also presented the testimony of Valerie Jonas, an attorney who provided materials to McClain that were relied on by Rivera in this proceeding; Susan Bailey, the Assistant State Attorney who handled the initial postconviction proceedings; Robert Rios, an officer who interrogated Rivera and performed a polygraph examination on Zuccarello; and Edward Malavenda, Rivera's trial counsel.

Malavenda testified that Zuccarello was a jailhouse informant who hoped to receive leniency for his testimony. Malavenda did not recall having Zuccarello's plea offer during trial, and testified that he would have cross-examined Zuccarello with respect to the plea offer if he had it. Malavenda also did not recall various other documents Rivera now relies on, and was unaware that Zuccarello had been involved in a homicide.

Keffer and Braden testified with regard to their recollections and procedures during their respective representations of Rivera. Keffer testified she was aware that Zuccarello had acted as a State witness in several cases, but until newspaper articles about Zuccarello's testimony in other cases were published in 1998, she did not know that his credibility was challenged, or the extent to which he received favor from law enforcement. Braden recalled that during the initial postconviction proceedings, an evidentiary hearing was held on a Brady/Giglio claim with respect to jailhouse informants. He suspected a plea arrangement or offer existed, and recalled that Zuccarello stood out because of his testimony during trial that he received a deal in another case. Neither Braden nor Keffer recalled ever seeing Zuccarello's plea offer. They also did not recall seeing various other documents Rivera relies on in this successive postconviction proceeding.

McClain testified with respect to the documents he received from Jonas. Among those items were the affidavits of Warren Holmes, who conducted a polygraph examination of Zuccarello, and Tony Fantigrassi, who was the Captain of the Broward County Sheriff's Office. Both Holmes and Captain Fantigrassi asserted in the affidavits that Zuccarello provided false information during homicide investigations. McClain also testified that after a newspaper article was published in which Detective Rios indicated Rivera invoked his right to counsel during an interrogation, McClain met with Rios and obtained both the report of

- 11 -

that interrogation and the results of a polygraph examination Rios conducted on Zuccarello.

Assistant State Attorney Bailey testified with respect to her procedures in responding to records requests, and various documents that she asserted were disclosed to the defense, including the Zuccarello plea offer. She testified that letters written by her in 1994 and sent to Rivera's counsel documented what files were disclosed, as well as what documents were withheld from those files. The letters confirmed that the contents of various files, including those of Zuccarello and his associates Jay and Scott Richitelli, were disclosed during the initial postconviction proceedings. She testified that one of the Richitelli files included the plea offer and a letter that referenced the plea offer. However, Bailey testified that she did not recall certain documents being in the file of the State Attorney's Office, including the incident and disciplinary reports regarding Zuccarello's behavior in jail, and the Fantigrassi and Holmes affidavits.

Rios testified with respect to the interrogation of Rivera that he conducted in 1986. Before he arrived for the interrogation, he requested that Rivera be informed of his rights under Miranda. Upon his arrival, Rios asked Rivera whether he had been informed of the Miranda rights, and Rivera responded in the affirmative. Rios did not repeat the Miranda warnings and began the interrogation, during which Rivera stated he was not involved in Staci's homicide. Rios testified that

approximately an hour and a half after the interrogation began, Rivera became upset and stated, "I want my lawyer. I am telling you I want my lawyer, like I told those two guys I want my lawyer and I want my lawyer."[7] Rivera also stated, "[t]his is the same bullshit as before." Rios testified that he stopped the interrogation, left the room, and asked the two detectives who provided the <u>Miranda</u> warnings whether Rivera had asked for an attorney. The detectives responded that Rivera had not. Rios testified that the report documenting this interaction was not provided to Kelly Hancock, the prosecutor of Rivera's trial.

Rios also testified that he performed a polygraph examination of Zuccarello in relation to the Cohen homicide. During the examination, Zuccarello provided various accounts of the homicide, but ultimately recited a final version in which he admitted he was present. Rivera was not mentioned at any point during the polygraph examination.

In response, the State presented Bailey, Hancock, and Bruce Raticoff, who was Zuccarello's counsel. Hancock testified that Starr Peck, who Rivera informed during a phone call that he had killed Staci, was the witness who "broke the case." Additionally, Hancock testified that the most damaging evidence against Rivera was the testimony of the young girl who Rivera previously attempted to molest and

---

7. The Rios report indicates that Rivera yelled, "you can't hold me here any longer, I want my [l]awyer now."

strangle. Hancock also testified that he did not promise Zuccarello anything in exchange for his testimony or provide any reward. Further, he was not a party to any of the conditions in the plea agreement, and was not even aware of the plea during the prosecution of Rivera.

Raticoff testified that the linchpin for the plea deal between Zuccarello and the State was the information Zuccarello provided regarding the Cohen homicide. He testified that to his knowledge, Zuccarello's testimony against Rivera was not contemplated by the plea, and Zuccarello was not a CI. Raticoff also testified that he did not draft the plea offer, and did not know the extent or content of the conversations between Zuccarello and law enforcement.

The postconviction court subsequently denied the remanded claims presented in the successive motion as procedurally barred because Rivera had not established due diligence. The postconviction court also concluded that the Brady and Giglio claims were without merit, and the ineffective assistance of counsel claim was insufficiently pled. Finally, the postconviction court ruled that the newly discovered evidence was not of such a nature that it would probably produce an acquittal in a retrial, even when considered together with all admissible evidence presented during the various postconviction proceedings.

## ANALYSIS

### Due Diligence

In a successive rule 3.850 motion, a defendant must establish that the facts for any claims raised could not have been discovered earlier through the exercise of due diligence. This Court has explained:

> A second or successive motion for postconviction relief can be denied on the ground that it is an abuse of process if there is no reason for failing to raise the issues in the previous motion. See Pope v. State, 702 So. 2d 221, 223 (Fla. 1997). Although claims that could have been raised in a prior postconviction motion are procedurally barred, this Court has held that a defendant may file successive postconviction relief motions that are based on newly discovered evidence. See White v. State, 664 So. 2d 242, 244 (Fla. 1995). In order to overcome a procedural bar, a defendant must show that the newly discovered facts could not have been discovered with due diligence by collateral counsel and raised in an initial rule 3.850 motion.

Owen v. Crosby, 854 So. 2d 182, 187 (Fla. 2003).

With respect to due diligence, before remanding Rivera's claims in Rivera IV for an evidentiary hearing, this Court stated:

> Rivera alleges that he did not have the plea offer to Zuccarello or other key State documents at the time of trial or during the prior postconviction proceedings. Since no evidentiary hearing has been held, we must accept these allegations as true to the extent they are not refuted by the record. See Peede v. State, 748 So. 2d 253, 257 (Fla. 1999).
>        . . . .
> While the State alleges that it complied with Rivera's requests, the records of the prior proceedings do not clearly establish or identify what materials were turned over to Rivera. In fact, certain materials concerning Zuccarello appear to have been withheld. The records from the first postconviction proceedings suggest that Rivera's efforts to discover information about Zuccarello were repeatedly avoided by the State through its limited responses to public records requests.

> Based on the record before us, the State has not sufficiently demonstrated that these claims are procedurally barred as successive.

995 So. 2d at 195-96 (emphasis supplied). Rivera contends this language indicates that the burden is on the State to establish which specific documents were actually received by collateral counsel. We disagree. In a successive postconviction motion, it is incumbent on the defendant to demonstrate that his claims could not have been raised in the initial postconviction motion through the exercise of due diligence. See Zeigler v. State, 632 So. 2d 48, 51 (Fla. 1993) ("Th[e procedural] bar can be overcome if the movant can show that the grounds asserted were not known and could not have been known to him at the time of the earlier motions." (emphasis supplied)). In contrast to this appeal, no evidentiary hearing had been conducted prior to our decision in Rivera IV. 995 So. 2d at 197 n.2 ("Although Rivera's motion was initially filed under rule 3.850, our current rule 3.851 . . . articulates this Court's long-time policy establishing a presumption in favor of holding evidentiary hearings.").

During the evidentiary hearing, Rivera presented the testimony of various witnesses to establish what documents were not disclosed. Of those witnesses, Braden was the only one who represented Rivera before the circuit court during his initial postconviction proceedings, and he began his representation in December 1994, shortly before the final amended rule 3.850 motion was filed on January 3, 1995. In response, the State presented the testimony of Bailey, who responded to

- 16 -

the public records requests made during the initial postconviction proceedings. Bailey testified with respect to letters she sent to Judith Dougherty, who represented Rivera prior to Braden, that documented the names of files disclosed to Rivera, as well as the type of material that was withheld as exempt. After hearing the conflicting testimony regarding what documents were disclosed, the postconviction court found that Rivera did not establish due diligence. We review the factual findings of the postconviction court for competent, substantial evidence. Cf. Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997).

Rivera's claims relate to various documents presented during the evidentiary hearing, including: (1) the Zuccarello plea offer; (2) Rios's report of the interrogation, which indicated that Rivera requested to speak with counsel; (3) the "prisoner receipts" regarding Zuccarello's movements in and out of jail; (4) the written synopsis of a conversation with Zuccarello prepared by Detective Joseph Gross of the Miami-Dade Police Department, which refers to Zuccarello as a CI; (5) a report regarding an interview of Zuccarello that refers to him as a CI and that also indicates he went out on location with detectives, also authored by Detective Gross; (6) an unnamed list that summarized the crimes Zuccarello provided information about, which refers to Zuccarello as a CI;[8] (7) a memo stating that

_____

8. Rivera asserts in his initial brief that all three documents were written by Detective Gross. However, nothing on the document indicates who wrote it, or the actual name of the individual referred to as the CI. It appears that during the

Zuccarello acted above the law while in jail because he could request intervention by the state attorney handling his case; and (8) several incident reports regarding Zuccarello's behavior in jail, as well as a corresponding disciplinary report for one incident.[9]  We conclude that Rivera has failed to establish due diligence by counsel with respect to these documents, and therefore the claims based on these documents are procedurally barred.  See Owen, 854 So. 2d at 187.

Rivera asserts that the postconviction court failed to assess diligence from the perspective of counsel during the initial postconviction proceedings, contrary to the holding of this Court in Waterhouse v. State, 82 So. 3d 84 (Fla. 2012).  In Waterhouse, both trial and postconviction counsel relied on a police report that stated a witness did not remember when the defendant or the victim left a lounge on the night of the murder.  Id. at 102.  Counsel did not contact the witness because of this report, but the witness later stated that the report did not accurately reflect

---

proceedings below, this document was considered together with the document prepared by Detective Gross that reflected a synopsis of his conversation with Zuccarello.

9. Rivera alleged below that he exercised diligence with respect to two polygraph reports.  However, although he includes the testimony regarding these reports in the facts section of his initial brief, Rivera does not present any specific arguments as to these documents under the diligence, Brady, or Giglio challenges.  Accordingly, any claim with respect to the polygraph reports has been waived.  We also note that the polygraph reports would not have been admissible during trial without the consent of the State.  See Walsh v. State, 418 So. 2d 1000, 1002 (Fla. 1982).

- 18 -

the information he provided to the police.  Id. at 90.  The State asserted that counsel was not diligent because the reference to the witness in the police report provided notice that the individual was a potential witness.  Id.  This Court held that counsel is permitted to rely on the veracity of a police report, and due diligence is met if (1) a witness swears in an affidavit that he or she spoke to police about the crime, but the report ultimately contained inaccurate or false information, and (2) counsel swears that he or she relied on the veracity of the report and did not contact the witness because the report indicated the witness could not provide any pertinent information.  Id. at 104.  The Court explained that

> [t]o place the onus of verifying every aspect of an unambiguous police report on defense or collateral counsel would not only create a substantial amount of work in a capital case, but also could be viewed as downplaying the seriousness of allegedly false police reports.

Id. at 103.  However, this case is not comparable to Waterhouse because Rivera's counsel during the initial postconviction proceedings did not rely on any reports that contained incorrect information, but rather were either in possession, or through the exercise of due diligence should have been in possession, of the information now relied on by Rivera during the relevant time period.

Similarly, Rivera's reliance on Lightbourne v. State, 742 So. 2d 238 (Fla. 1999), is misplaced.  In Lightbourne, counsel testified they diligently searched for a witness during a prior proceeding.  Id. at 245-46.  The State asserted that a search of the National Crime Information Center (NCIC) would have revealed the

location of the witness.  Id. at 246.  This Court noted that whether counsel was entitled to NCIC records was inconclusive in the record, and the State had asserted in another case that NCIC records were not available through a public records request.  Id.  The Court held that the testimony of the witness was not procedurally barred in the successive motion for postconviction relief.  Id.  However, here, unlike in Lightbourne, Rivera has not established that the documents relied on in this motion were unavailable to counsel during the initial postconviction proceedings.  Further, the State below presented competent, substantial evidence that the documents, and information that reasonably should have led to the discovery of the documents, were disclosed to Rivera's initial postconviction counsel.

With respect to the plea offer, Bailey testified it was disclosed to Rivera in multiple files:

> I did not withhold it.  It is in the State's file.  Our copy company, we haven't had any problems.  It is there now.  They didn't insert it there. So sure, it's sure possible that that was the one document they failed to photocopy.  But it is in, I believe it is in one of the Zuccarello files and one of the [Richitelli] cases, as well as the PSI [presentence investigation] and Zuccarello's court file.

She also testified that nothing was withheld from one of the files that included the plea offer:

> This is, the original [plea offer] is located in that file. . . .  As I have indicated, nothing was withheld from that file.  That document was

- 20 -

absolutely sent within that case file to Ms. Dougherty and her investigator.

This constitutes competent, substantial evidence that supports the finding of the postconviction court that Rivera was in possession of the plea offer during his initial postconviction proceedings.

With respect to the documents Rivera relies on to assert Zuccarello was a CI or received undisclosed benefits from the State, including the prisoner receipts and the jail records, Rivera's initial postconviction counsel also possessed sufficient information to raise this claim. Indeed, during the initial postconviction proceedings, Rivera alleged that the "jailhouse snitches" who testified during his trial were offered leniency in exchange for their testimony, and specifically that Zuccarello acted as a professional informant. Moreover, both Keffer and McClain admitted during the evidentiary hearing that they were aware Zuccarello testified in various other cases for the State, and the State presented evidence that was disclosed to Rivera indicating Zuccarello was a witness in various cases.

Additionally, during the evidentiary hearing, the State presented evidence that the Jay Richitelli file included a letter in which the assistant state attorney wrote to counsel for Richitelli, "I know of no confidential informant in your client's case; at the time of the report, Mr. Zuccarello was referred to as an informant, but that is not now the case." The State also presented evidence that a deposition of a Miami-Dade Police Department officer was disclosed that

discussed efforts by Zuccarello to negotiate with law enforcement. For example, the officer stated in the deposition that Zuccarello

> was not going to be completely—he was not going to lie to us, but that he was going to hold some aces in his pocket until—at that point, he didn't have a deal, a firm deal, so he was going to hold things back, that he was going to wait and see what kind of deal we offered him, and then he was going to provide us with other things and see if he couldn't get a better deal. . . . He talked—there's something like twenty-nine different cases. . . . Just about every case that exists, you know, he talked about.

The officer also stated during the deposition, "[i]t was an ongoing negotiation and I don't know when he got his plea." Thus, with regard to Zuccarello's involvement with law enforcement, this information was available to postconviction counsel, and Rivera has failed to establish due diligence.

With respect to the Rios interrogation report, Rios interrogated Rivera during the investigation, and both trial and initial postconviction counsel were aware of this interrogation. Additionally, Rivera's initial postconviction counsel subpoenaed Rios, but released him from the subpoena without questioning. Simply questioning Rios before trial or in 1994 would have led to the information on which the current claim is based. Thus, we conclude Rivera failed to establish due diligence with respect to this claim.

Although we conclude Rivera has failed to establish due diligence with respect to the claims raised in his successive postconviction motion, we also address the merits of these claims and conclude that Rivera is not entitled to relief.

To establish a claim for relief under Giglio, the defendant must demonstrate that (1) the prosecutor either presented or failed to correct false testimony, (2) the prosecutor knew the testimony was false, and (3) the evidence was material. See Jones v. State, 998 So. 2d 573, 580 (Fla. 2008). If the defendant establishes the first two prongs, then the evidence is deemed material if there is any reasonable possibility that it could have affected the verdict, and the State bears the burden of proving the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id. In reviewing Giglio claims, we employ a mixed standard of review under which findings of fact are reviewed for competent, substantial evidence, and whether the facts are sufficient to establish each element of the test is reviewed de novo. Id.

Rivera's Giglio claim relates to the Zuccarello plea offer and his alleged status as a CI. During Rivera's trial, Zuccarello testified that he notified law enforcement of inculpatory statements by Rivera because he believed what Rivera did "was a sick act." Rivera contends that Zuccarello was actually a CI who acted as an agent of the State, and was required to cooperate with law enforcement

against Rivera pursuant to a plea offer he accepted.[10] In pertinent part, the plea

offer states:

> III. In return for the considerations shown above, the defendant will continue to cooperate with: Florida Department of Law Enforcement (lead agent: Steve Emerson); Broward Sheriff's Office (detectives Presley, Argentine, Sgt. Carney); Ft. Lauderdale Police Department (detective Pott); [ASAs] Lazarus and Pyers, and their investigators; and other law [enforcement] offices.
>
> The defendant will, in his cooperation, be giving statements, which will be tested by polygraph as to their veracity; the defendant will further agree to testify at all proceedings in which he is subpoenaed[,] and the defendant will testify honestly.
>
> IV. In return for the above considerations, the defendant will not be charged with any additional cases in Broward [C]ounty in which he may have participated, EXCEPT: any cases in which injuries to any person resulted will be examined on a case-by-case basis, and a filing decision made accordingly. Any participation in any HOMICIDE case will be handled separate and apart from this agreement, by Assistant State Attorneys in the Homicide division.
>
>     . . . .
>
> VI. At time of sentencing, it will be requested by the State that such proceedings be held in chambers, at which time the State will bring forward all law enforcement personnel familiar with the cases and the efforts of the defendant for the Court's consideration in sentencing.

---

10. During the evidentiary hearing, Rivera also presented a letter written by Zuccarello that Rivera asserted was evidence Zuccarello attempted to befriend him to obtain information for law enforcement. In the letter, Zuccarello referred to Rivera as "buddy," and he signed the letter as "your friend Frank." Trial counsel Malavenda did not recall whether he had previously seen the letter.

During the evidentiary hearing, the State presented Bruce Raticoff, who represented Zuccarello when the plea offer was extended. Raticoff testified that his understanding of the plea deal was that Zuccarello would cooperate with any and all law enforcement officers, predominantly in the Cohen homicide, and provide information regarding his and his codefendants' participation in other home invasions. To Raticoff's knowledge, the paragraph that required Zuccarello to continue to cooperate with law enforcement did not pertain to his involvement in Rivera's case. Indeed, Raticoff did not recall any mention of Rivera during his discussions of the deal with Zuccarello. Additionally, when asked whether any preferential treatment Zuccarello received in jail had anything to do with the Rivera case, Raticoff testified it did not. Although Raticoff testified that he was not aware of the "nuts and bolts" of the deal, and was deliberately unaware of what Zuccarello discussed with law enforcement, he consistently testified that he did not understand the plea deal to include the testimony against Rivera.

With respect to timing, the plea was entered into on June 12, 1986, and Zuccarello was sentenced on March 13, 1987. Thus, both of these events preceded Rivera's trial, which occurred in April 1987. A motion to mitigate sentence filed by Zuccarello was granted on May 12, 1987. Zuccarello testified during Rivera's trial that although nothing was promised to him for his testimony against Rivera, he hoped that it would be considered with respect to the motion.

During the evidentiary hearing, the State also presented Kelly Hancock, who prosecuted Rivera. Hancock testified that he was not a party to any of the conditions in the plea agreement, Zuccarello did not cooperate with him in exchange for more lenient treatment, and he was not aware of the plea during his prosecution of Rivera. Hancock also did not recall the plea offer, but testified that he had an open-file policy and if the plea was in the file, it would have been available to the defense. Although Zuccarello contacted Hancock after Rivera's trial regarding an incentive program, and Hancock wrote a letter requesting that Zuccarello be placed in the program, Hancock asserted that this was not a reward for the testimony against Rivera.

The postconviction court found that the plea offer did not pertain to Zuccarello's testimony against Rivera. This finding is supported by competent, substantial evidence. Raticoff repeatedly testified that the purpose of the plea offer was to secure Zuccarello's cooperation with respect to home invasion robberies and the Cohen homicide, and did not encompass the testimony in this case. Accordingly, the record below supports a conclusion that Zuccarello did not falsely testify when he stated he received no deal or promise in return for his testimony against Rivera, and Rivera has failed to demonstrate a Giglio violation based on the plea agreement. See Wyatt v. State, 71 So. 3d 86, 107 (Fla. 2011).

- 26 -

Rivera also alleges a <u>Giglio</u> violation based on three documents that refer to Zuccarello as a CI, and four prisoner receipts tracking his release from jail into the custody of various law enforcement officers. With respect to the CI documents, the synopsis of a conversation written by Detective Gross states, in relevant part:

> On Friday, April 4, 1986 one FRANK ZUCCARELLO (<u>hereinafter referred to as the CI for the sake of brevity</u>) was interviewed by this writer [and three other officers] about an organized group that has committed a large number of home invasion robberies (HIR hereinafter).
> The first portion of the conversation was held in the robbery office and the second portion of the conversation was held on location as the CI pointed out various locations involved in the activity.

(Emphasis supplied.) Another report prepared by Detective Gross relates to the April 18, 1986, interview with Zuccarello concerning various home invasion robberies. This interview also occurred both at the robbery office and on location. The first paragraph of the report states: "1. Frank (alternatively referred herein as the CI) . . . ." The final, unnamed document lists information purportedly provided by Zuccarello regarding a number of crimes, not including Rivera's case, and throughout the document, that individual is referred to as "CI" or "the CI." With respect to the prisoner receipts, they indicate that Zuccarello was taken out of the jail on April 1, 1986; April 4, 1986; April 17, 1986 (specifically into the custody of Detective Argentine); and July 17, 1986 (into the custody of Detective Amabile).[11]

_____

11. Detective Argentine was one of the law enforcement personnel with whom the plea offer required Zuccarello to cooperate. Detective Amabile was one

However, Raticoff testified that, to his knowledge, "Zuccarello was not, is not, never has been a confidential informant." He also testified that Zuccarello was neither documented as, nor acted as, a CI. Additionally, Raticoff testified that he would have taken exception to police considering Zuccarello or using him as a CI without first consulting his attorney, i.e., Raticoff.

The postconviction court found that Zuccarello was not a CI, and this finding is supported by competent, substantial evidence. Not only did Zuccarello's attorney testify he had no knowledge of Zuccarello acting as a CI, one of the documents explicitly states that Zuccarello was referred to as a CI simply for brevity. Accordingly, because Rivera has failed to establish that Zuccarello was a CI, he has failed to establish a Giglio violation. See Wyatt, 71 So. 3d at 107.

### Brady

To establish a Brady violation, the defendant must show that (1) favorable impeachment or exculpatory evidence, (2) was willfully or inadvertently suppressed by the State, and (3) the evidence was material, resulting in prejudice to the defendant. Franqui v. State, 59 So. 3d 82, 101 (Fla. 2011). To establish the materiality prong, a defendant must demonstrate a reasonable probability that, had

---

of the officers who provided Rivera with the Miranda warnings before the Rios interrogation, and was otherwise involved in the investigation into the death of Staci. In his testimony during trial, Zuccarello stated that he spoke with Detective Argentine concerning statements Rivera made to him. He later testified that he told Detective Amabile about these statements.

the evidence been disclosed to the defense, the result of the proceeding would have been different.  Id.  In other words, evidence is material under Brady only if it undermines confidence in the verdict.  Id. at 102.

Rivera alleges Brady violations on several documents that relate to Zuccarello's relationship with law enforcement, including the plea offer, two[12] documents that describe Zuccarello as a CI, and prisoner receipts.  However, we conclude that even if Rivera could overcome the procedural bar—which he cannot—these documents are not material.[13]  Because the plea offer did not

12. Rivera presented during the evidentiary hearing a third document that referred to Zuccarello as a CI, the unnamed document relied on in the Giglio claim that contained a list of crimes.  However, he presents no argument under the Brady claim in relation to this third document, and, therefore, any Brady claim based on this document is waived.  Moreover, for the same reason the claim based on the other CI documents is without merit, any claim based on this document would similarly be without merit.

13. Additionally, in his amended successive postconviction motion, Rivera alleged Brady violations based on a memorandum and incident reports that refer to Zuccarello's behavior in jail.  However, these documents are referenced only in the facts and due diligence portions of Rivera's initial brief, and not in the Brady claim appealed to this Court.  Therefore, any claims regarding these documents have been waived.  However, we also note that a Brady claim based on these documents would be without merit.  With respect to the incident reports, these were equally available to Rivera as they were to the State.  See Stewart v. State, 801 So. 2d 59, 70 (Fla. 2001) (affirming the denial of a Brady claim based on jail records because they were equally available to the defendant).  With respect to the memorandum, it was written after Rivera's trial, and therefore was neither willfully nor inadvertently suppressed.  Wyatt, 71 So. 3d at 103 ("Wyatt's own experts testified that neither the 2008 letter nor any comprehensive research uncovering the flaws in [the comparative bullet lead analysis] existed until well after Wyatt's trial in 1991.

encompass Zuccarello's testimony against Rivera, it could be used only to demonstrate Zuccarello had a relationship with law enforcement and was, therefore, biased. Cf. Gorham v. State, 597 So. 2d 782, 784 (Fla. 1992) (holding that the status of a witness as a paid confidential informant constituted Brady material because the credibility of a witness may be attacked on the basis that the witness has a relationship with a party, a personal obligation to a party, or is employed by a party). Similarly, because Zuccarello was referred to as a CI simply for the sake of brevity, and not because he actually acted as a CI, these documents relate only to his motivation to aid law enforcement.

However, Zuccarello's motive for testifying was explored during trial. Zuccarello testified that he was convicted for twenty-three felonies—including armed robbery, armed burglary, aggravated assault, home invasion, and resisting arrest—which he pled guilty to pursuant to a plea deal that provided for only a seven-year sentence.[14] He also stated that prior to testifying, he filed a motion to mitigate his sentence, which was still pending at that time. Zuccarello sought to reduce his sentence to a term of five years' incarceration, and stated that he hoped his testimony against Rivera would benefit his motion to mitigate. Zuccarello

_____

Accordingly, the State could not have willfully or inadvertently suppressed such information.").

14. Zuccarello received concurrent sentences in both Miami-Dade and Broward Counties.

- 30 -

expected his total time of incarceration for a five-year sentence would be approximately two and a half years, and he had already served over one year. Further, one of the detectives Zuccarello spoke with testified that he may have told Zuccarello that he might speak to a judge regarding Zuccarello's cooperation in the Rivera case.

Additionally, during trial, John Meham, another inmate at the Broward County Jail, testified that Zuccarello and another jailhouse informant who testified against Rivera, William Moyer, attempted to gather information about Rivera to provide to law enforcement. Specifically, Meham testified that he "asked [Moyer] if [Rivera] ever told [Moyer] anything. [Moyer] said no, but Frank Zuccarello, and [another inmate], they got together, I guess, corroborated and was making a deal with the State for what the State wanted to hear to come in here." Meham also testified that Rivera did not speak to anyone about his case.

Thus, Zuccarello's testimony was significantly impeached during trial. The jury was aware that he entered into a plea agreement, did not expect to be incarcerated for more than two and a half years despite the large number of serious felony convictions, and hoped to receive a benefit from his testimony, although none was promised. Additionally, Rivera presented evidence during trial to suggest law enforcement solicited information from the jailhouse informants. We conclude that evidence of the actual plea offer and other documents Rivera alleges

- 31 -

would have impeached Zuccarello and law enforcement would have been largely cumulative to the existing impeachment, and therefore Rivera has failed to establish that it is material.  See Overton v. State, 976 So. 2d 536, 563 (Fla. 2007).  Moreover, as described under the claim regarding newly discovered DNA evidence, the evidence of guilt against Rivera was simply overwhelming, and these documents do not undermine our confidence in the outcome of Rivera's trial.  Franqui, 59 So. 3d at 102.

Rivera also alleges a Brady violation based on the Rios report.  However, he fails to establish how the report is material.  The postconviction court found that all interrogation ceased once Rivera invoked his right to counsel, and this finding is supported by competent, substantial evidence.  Rios did not testify during Rivera's trial, nor were any statements made by Rivera during the Rios interrogation presented during trial.  Thus, the report does not undermine confidence in the outcome of the trial.

Rivera alternatively pleads his Brady claim as an ineffective assistance of trial counsel claim.[15]  Although we disagree with the ruling of the postconviction court that the ineffective assistance of counsel claim was insufficiently pled, we conclude the claim is nonetheless procedurally barred.  See Pope, 702 So. 2d at

_____

15. To the extent that Rivera claims ineffective assistance of postconviction counsel, such a claim is not cognizable.  See Tompkins v. State, 994 So. 2d 1072, 1088 (Fla. 2008).

223. Moreover, the prejudice prong of an ineffective assistance of counsel claim involves the same analysis as the materiality prong of a <u>Brady</u> claim. <u>See</u> <u>Duest v. State</u>, 12 So. 3d 734, 744 (Fla. 2009). Because we conclude the documents Rivera bases this claim on are not material under <u>Brady</u>, the ineffectiveness claim is also without merit. <u>See</u> <u>Downs v. State</u>, 740 So. 2d 506, 513 n.10 (Fla. 1999) ("Because we find the underlying <u>Brady</u> claim to be without merit, we need not address the merits of Downs' corresponding ineffective assistance of counsel claim on this issue.").

### Newly Discovered DNA Evidence

This Court has explained that to succeed on a newly discovered evidence claim, the defendant must establish that (1) the evidence was not or through the exercise of due diligence could not have been known to the trial court, party, or counsel during the trial, and (2) the evidence is of such a nature that it would probably produce an acquittal on retrial. <u>Swafford v. State</u>, 125 So. 3d 760, 767 (Fla. 2013) (citing <u>Jones v. State</u> (<u>Jones II</u>), 709 So. 2d 512, 521 (Fla. 1998)). The second prong is satisfied if the evidence establishes a reasonable doubt as to the defendant's culpability. <u>Id.</u> (citing <u>Jones II</u>, 709 So. 2d at 526). To evaluate a newly discovered evidence claim, the trial court must consider all admissible newly discovered evidence and weigh the evidence together with that which was

introduced during trial.  Id. (citing Jones v. State (Jones I), 591 So. 2d 911, 915

(Fla. 1991)).  The trial court must determine

> whether the evidence goes to the merits of the case or whether it
> constitutes impeachment evidence.  The trial court should also
> determine whether this evidence is cumulative to other evidence in the
> case.  The trial court should further consider the materiality and
> relevance of the evidence and any inconsistencies in the newly
> discovered evidence.

Id. (quoting Jones II, 709 So. 2d at 521).  This Court reviews the postconviction

court's findings of fact, and findings on the credibility of witnesses and the weight

of the evidence, for competent, substantial evidence.  Id. (citing Green v. State, 975

So. 2d 1090, 1100 (Fla. 2008)).  However, this Court reviews the application of the

law to the facts de novo.  Id.

It is undisputed that the DNA test results that establish that the hair found in

Peters's van did not belong to Staci constitute newly discovered evidence.  Prior to

trial, a hair consistent with that of Staci was found in Mark Peters's van.  The hair

was relied on by the State during trial as evidence of Rivera's guilt.  Specifically,

the prosecutor remarked during opening statements that the hair found in the van

was compared with that of Staci and found to be similar.  During trial, the hair

comparison expert testified that it was his "scientific opinion that the hair from the

bed of the van could be concluded as being a source from the victim, item number

five, which was the head hair sample of the victim."  Nonetheless, during opening

statements and the expert's testimony, the caveat was added that such comparisons were not definitive. Indeed, during cross-examination, the expert testified:

> I would imagine if you were to go out and make a comparison on a hair, there's a good chance that the next guy you pick down the street might have the same similar characteristics or you might have to go through the whole State of Florida or Broward County to find it.

The limited value of the hair comparison was also emphasized by defense counsel during closing statements.

Rivera asserts that the newly discovered DNA evidence, together with all other evidence presented during trial and the postconviction proceedings, including Mark Peters's testimony that he was in possession of the van during the time Staci was abducted, establishes that Rivera did not commit the murder. We disagree. The DNA evidence simply confirms the possibility that was asserted during trial that the hair did not belong to Staci. Notably, the evidence is not exculpatory in nature, nor does it establish that Staci was never in contact with Rivera or in Peters's van. Moreover, the State presented ample evidence during trial that Rivera committed the murder, including the testimony of two non-jailhouse witnesses to whom Rivera confessed. Starr Peck testified that Rivera admitted to killing Staci, and a second woman testified that Rivera told her that Staci was gone and would not be found. Additionally, the jury heard testimony that Rivera exposed himself to numerous girls between the ages of ten and twenty years old; he thought about forcing young girls to have sex with him; he admitted that he

exposed himself to a girl on a bicycle;[16] and he previously attacked a girl the same age as Staci. Thus, we conclude the newly discovered DNA evidence is not of such a nature that it would probably produce an acquittal on retrial, and we affirm the denial of this claim.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's order denying successive postconviction relief on those claims that were remanded for an evidentiary hearing in Rivera IV.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
PARIENTE and CANADY, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Broward County,
    Paul Lawrence Backman, Judge - Case No. 061986CF011716A88810

Neal Andre Dupree, Capital Collateral Regional Counsel, Southern Region, Martin J. McClain, Special Assistant, Capital Collateral Regional Counsel, Southern Region, and Nicole M. Noel, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant

---

16. Staci was in possession of her bicycle before she was attacked. Rivera I, 531 So. 2d at 537.

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Consiglia Terenzio, Bureau Chief, West Palm Beach, Florida,

for Appellee