# Supreme Court of Florida

_____

No. SC17-1991
_____

**MICHAEL T. RIVERA,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 20, 2018

PER CURIAM.

This case is before the Court on appeal from an order denying a motion to vacate a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1) of the Florida Constitution.

**FACTS AND BACKGROUND**

Michael T. Rivera was convicted of first-degree murder and was sentenced to death. *Rivera v. State* (*Rivera I*), 561 So. 2d 536, 537 (Fla. 1990). In affirming

his convictions and sentences on direct appeal, this Court set forth the pertinent

facts pertaining to Rivera's case:

> Eleven-year-old Staci Lynn Jazvac left her Lauderdale Lakes home on bicycle at about 5:30 p.m. on January 30, 1986, to purchase poster board at a nearby shopping center. A cashier recalled having sold her a poster board between 6:30 and 7:00 p.m. When Staci failed to return by dusk, her mother began to search. At about 7:30 p.m. the mother encountered a Broward County Deputy Sheriff, who had Staci's bicycle in the trunk of his car. The deputy found the bicycle abandoned in a field alongside the shopping center. A police investigation ensued.
>
> Police first connected Michael Rivera to Staci's murder through a complaint filed by Starr Peck, a Pompano Beach resident. She testified that she had received approximately thirty telephone calls during September 1985 from a man who identified himself as "Tony." He would discuss his sexual fantasies and describe the women's clothing he wore, such as pantyhose and one-piece body suit. She received the last telephone call from "Tony" after Staci's murder. Ms. Peck testified that he said he had "done something very terrible. . . . I'm sure you've heard about the girl Staci. . . . I killed her and I didn't mean to. . . . I had a notion to go out and expose myself. I saw this girl getting off her bike and I went up behind her." She testified that he had admitted putting ether over Staci and dragging her into the back of the van where he sexually assaulted her. Rivera had been employed by Starr Peck, and she identified him as "Tony."
>
> On February 13, Detectives Richard Scheff and Phillip Amabile of the Broward County Sheriff's Department took Rivera into custody on unrelated outstanding warrants and transported him to headquarters where they told him that they wanted to speak to him. Detective Scheff testified that Rivera responded, "If I talk to you guys, I'll spend the next 20 years in jail." After reading Rivera his Miranda rights,[n.2] Detective Scheff told Rivera that someone had advised them that Rivera had information about the disappearance of Staci Jazvac. The detective testified that Rivera admitted making the obscene phone calls to Starr Peck but denied having abducted or murdered Staci.

[n.2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, L.Ed. 2d 694 (1966).

In subsequent interviews, Rivera admitted that he liked exposing himself to girls between ten and twenty years of age. He preferred the Coral Springs area because its open fields reduced the likelihood of getting caught. He would often borrow a friend's van and commented that "every time I get in a vehicle, I do something terrible." Rivera then admitted to two incidents. In one, he said he had exposed himself to a girl pushing a bike. When asked what he did with her, Rivera replied: "Tom, I can't tell you. I don't want to go to jail. They'll kill me for what I've done." In the other, he said he had grabbed another young girl and pulled her into some bushes near a Coral Springs apartment complex.

Staci's body was discovered on February 14 in an open field in the city of Coral Springs, several miles from the site of the abduction. Dr. Ronald Keith Wright, a forensic pathologist, testified that most of the upper part of the body had decomposed and that the body was undergoing early skeletonization. The doctor concluded that death was a homicide caused by asphyxiation, which he attributed to ether or choking.

Dr. Wright observed that the body was completely clothed, although the jeans were unzipped and partially pulled down about the hips, and the panties were partially torn. Dr. Wright opined that this could be the result of the expansion of gasses during decomposition and not sexual molestation. He was unable to determine whether she was sexually assaulted. He discovered a bruise on the middle of the forehead that occurred before death, but he could not testify with certainty as to the cause. He also observed a broken fingernail on her right hand index finger, which he could not interpret as evidence of a struggle. Dr. Wright believed that the body was carried to the field and dumped, and at that time Staci was either dead or unconscious.

The jury heard testimony from several of Rivera's fellow inmates. Frank Zuccarello testified that Rivera admitted that he had choked another child, Jennifer Goetz, in the same way he had choked Staci; that Rivera said he had tried to kill Jennifer but was frightened away; and that Rivera said he had taken Staci to the field where she screamed and resisted, and he choked her to death after things got out of hand. Rivera also admitted that he told Starr Peck that he had murdered Staci, saying that confiding in her was the biggest mistake

of his life. William Moyer testified that Rivera had stated to him: "You know, Bill, I didn't do it, but Tony did it." He later overheard Rivera call Starr Peck and identify himself as "Tony." Peter Salerno testified that Rivera told him: "I didn't mean to kill the little Staci girl. I just wanted to look at her and play with her."

A manager of a Plantation restaurant testified that he had received over two hundred telephone calls during a two-year period from an anonymous male caller. On February 7, the Friday before Staci's body was discovered, the caller identified himself as "Tony" and said that he "had that Staci girl" while wearing pantyhose, and that he had put an ether rag over her face.

The jury returned a verdict of guilty as charged.

During the penalty phase, the state introduced evidence of prior convictions.[n.3] Rivera introduced the testimony of his sisters, Elisa and Miriam, through whom the jury learned that Rivera was himself the victim of child molestation. Rivera's present girlfriend testified that she had no concerns about leaving him with her children. Rivera's former girlfriend was allowed to testify under an alias. She expressed the opinion that Rivera had two personalities. Through Michael he demonstrated a good side and through "Tony" he exposed his dark side which compelled him to do terrible things.

> [n.3] On November 6, 1986, Rivera was convicted of attempted first-degree murder, kidnapping, aggravated child abuse, and aggravated battery. The state conceded that those crimes were on appeal. However, there were other felonies involving the use or threat of violence of which Rivera stood convicted and which were not on appeal. They include the October 1980 crimes of burglary with intent to commit battery and of indecent assault on a female child under the age of fourteen.

Dr. Patsy Ceros-Livingston, a clinical psychologist, interviewed Rivera in jail. She diagnosed Rivera as having a borderline personality disorder, which is characterized by impulsivity, a pattern of unstable and intense interpersonal relationships, lack of control of anger, identity disturbance, affective instability, intolerance of being alone, and physically self-damaging acts. The doctor also diagnosed exhibitionism, voyeurism, and transvestism.

Dr. Ceros-Livingston opined that Rivera acted under extreme duress and that he had some special compulsive characteristics that substantially impaired his capacity to appreciate the criminality of his conduct or to conform this conduct to the requirement of the law.

The jury unanimously recommended the death penalty. The trial judge found four aggravating circumstances,[n.4] one statutory mitigating circumstance,[n.5] and no nonstatutory mitigating circumstances.

> [n.4] § 921.141(5)(b), (d), (h), (i), Fla. Stat. (1985) (previous conviction of felony involving the threat or use of violence; murder committed during the commission of an enumerated felony; murder especially heinous, atrocious, or cruel; and murder committed in a cold, calculated, and premeditated manner[1]).

> [n.5] § 921.141(6)(b), Fla. Stat. (1985) (defendant under the influence of extreme mental or emotional disturbance).

*Id.* at 537-38. Because Rivera did not file a petition for writ of certiorari in the United States Supreme Court, his conviction and sentence became final on September 22, 1990. *See* Fla. R. Crim. P. 3.851(d) ("(1) . . . For the purposes of this rule, a judgment is final: (A) on the expiration of the time permitted to file in the United States Supreme Court a petition for writ of certiorari seeking review of the Supreme Court of Florida decision affirming a judgment and sentence of death (90 days after the opinion becomes final); . . . .").

---

1. We later struck the cold, calculated, and premeditated aggravating factor on direct appeal. *Rivera I*, 561 So. 2d at 540.

We affirmed the denial of Rivera's initial motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850 on all claims but that of the penalty phase effectiveness of counsel, which we reversed and remanded for an evidentiary hearing. *Rivera v. State* (*Rivera II*), 717 So. 2d 477, 479 (Fla. 1998). After conducting an evidentiary hearing, the postconviction court again denied relief. *Rivera v. State* (*Rivera III*), 859 So. 2d 495, 499 (Fla. 2003). Rivera appealed that denial to this Court and filed a petition for writ of habeas corpus. *Id.* We affirmed the postconviction court's denial of relief and denied the petition for writ of habeas corpus. *Id.*

Rivera filed his first successive motion for postconviction relief pursuant to rule 3.850, which the postconviction court denied. *Rivera v. State* (*Rivera IV*), 995 So. 2d 191, 192 (Fla. 2008). This Court remanded for an evidentiary hearing on Rivera's newly discovered evidence claim and on his claims of *Brady*[2] and *Giglio*[3] violations, and affirmed the postconviction court's denial on all other claims. *Id.* Following the evidentiary hearing, the postconviction court again denied Rivera's claims. *Rivera v. State* (*Rivera V*), 187 So. 3d 822, 828 (Fla. 2015). On appeal

---

2. *Brady v. Maryland*, 373 U.S. 83 (1963).

3. *Giglio v. United States*, 405 U.S. 150 (1972).

from the postconviction court's denial, we affirmed the denial of relief on the claims that were remanded for an evidentiary hearing. *Id.* at 841.

After our release of *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), Rivera filed a second successive motion for postconviction relief, which the postconviction court struck pursuant to the State's motion. Rivera then filed an amended second successive motion for postconviction relief, which the postconviction court again denied. Rivera appealed that denial to this Court. On November 21, 2017, we issued an order to show cause why the postconviction court's order should not be affirmed in light of our decision in *Hitchcock v. State*, 226 So. 3d 216 (Fla. 2017), to which both Rivera and the State responded. *Rivera v. State*, No. SC17-1991 (Fla. order filed Nov. 21, 2017). Then, on February 22, 2018, after reviewing the responses to the order to show cause, we directed further briefing on non-*Hurst* related issues. *Rivera v. State*, No. SC17-1991 (Fla. order filed Feb. 22, 2018).

## ANALYSIS

### I.

In his first claim, Rivera contends that the postconviction court erred in denying his motion for enlargement of the page limitation. Rivera also contends that the postconviction court violated his due process rights by failing to hold a case management conference, pursuant to *Huff v. State*, 622 So. 2d 982 (Fla. 1993), before ruling on his second successive motion for postconviction relief. We

conclude that Rivera's argument with regard to the page limitation is meritless. Moreover, in accordance with our extensive precedent on the failure to hold *Huff* hearings for successive motions for postconviction relief, we further conclude that any error here was harmless.

## A.

Rivera argues that the postconviction court's denial of his motion to exceed page limitation deprived him of equal protection, asserting in part that other capital defendants were allowed to file successive postconviction motions in excess of twenty-five pages. In doing so, he takes issue with rule 3.851 itself as much as with the postconviction court's denial of that motion. *See* Initial Br. 11 ("There is no page limitation on successive 3.850 motions. It defies logic to impose a page limitation in a capital case when one is not imposed in a non-capital case.").

We review discretionary decisions made by trial judges under an abuse of discretion standard. *Bryant v. State*, 901 So. 2d 810, 817 (Fla. 2005). "When there is sufficient evidence to support the conclusion of the lower court, we may not substitute our judgment for that of the trial judge." *Mason v. State*, 597 So. 2d 776, 779 (Fla. 1992). "If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203

(Fla. 1980).  Thus, we examine the postconviction court's denial of Rivera's motion to exceed the page limitation under an abuse of discretion standard.

Florida Rule of Criminal Procedure 3.851(e)(2) states that a successive motion for postconviction relief shall not exceed twenty-five pages.  Fla. R. Crim. P. 3.851(e)(2).  Here, Rivera filed a motion to exceed the page limitation, which requested permission to file a twenty-nine page successive motion for postconviction relief, stating that a page enlargement was necessary because "[t]he procedural, factual, and legal aspects of Rivera's *Hurst* claim are complex, particularly given the size of the record in this case and its lengthy procedural history."  The State objected to the motion, arguing that, because *Hurst* is inapplicable to Rivera's case, there was no good cause to exceed the page limit, which the State claimed would actually be in excess of twenty-nine pages due to the use of smaller font size on twenty of those pages.  The postconviction court ultimately denied Rivera's motion.

Given that Rivera's conviction and death sentence became final well before *Ring v. Arizona*, 536 U.S. 584 (2002), was decided, and that all of his claims in the instant successive postconviction motion centered on his alleged entitlement to *Hurst* relief, we conclude that it was reasonable for the postconviction court to deny his motion to exceed page limit.  Thus, the lower court's denial does not constitute an abuse of discretion.

Next, Rivera asserts that the postconviction court's failure to hold a case management conference denied him due process. In *Huff*, we stated:

> Because of the severity of punishment at issue in a death penalty postconviction case, we have determined that henceforth the judge must allow the attorneys the opportunity to appear before the court and be heard on an initial 3.850 motion. This does not mean that the judge must conduct an evidentiary hearing in all death penalty postconviction cases. Instead, the hearing before the judge is for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion.

622 So. 2d at 983. This *Huff* hearing requirement was later expanded to include rule 3.851 motions. *See* Fla. R. Crim. P. 3.851(f)(5)(B).

Nevertheless, in *Groover v. State*, 703 So. 2d 1035 (Fla. 1997), we elaborated that our holding in *Huff* was limited to *initial* death penalty postconviction motions. *Id.* at 1038. We noted that, although *Huff* hearings are preferred in order to allow the parties to present their legal arguments, one was not required in Groover's case because his successive postconviction motion was without merit. *Id.* "[E]ven if a *Huff* hearing had been required in [*Groover*], the court's failure to do so would be harmless as no evidentiary hearing was required and relief was not warranted on the motion." *Id.* Moreover, we have repeatedly upheld our holding in *Groover* with regard to *Huff* hearings on legally insufficient or meritless successive postconviction motions. *See Marek v. State*, 14 So. 3d 985, 999 (Fla. 2009) (holding that the failure to hold a *Huff* hearing on Marek's fourth

- 10 -

successive postconviction motion that was legally insufficient on its face and without merit was harmless, stating that "[t]he failure to hold a hearing on a successive postconviction motion that is legally insufficient on its face is harmless error" (citing *Davis v. State*, 736 So. 2d 1156, 1159 n.1 (Fla. 1999); *Groover*, 703 So. 2d at 1038)); *Davis*, 736 So. 2d at 1159 n.1 ("In view of the fact that the instant motion is successive and legally insufficient on its face, we find this error harmless." (citing *Groover*, 703 So. 2d at 1038)); *see also Mordenti v. State*, 711 So. 2d 30, 32 (Fla. 1998) (holding a failure to hold a *Huff* hearing on Groover's *fourth* successive postconviction motion was harmless error whereas the same lack of *Huff* hearing on Mordenti's *first* motion for postconviction relief was not). Therefore, we have repeatedly emphasized that the failure to hold a *Huff* hearing on legally insufficient or meritless successive postconviction motions is harmless error.

Here, the postconviction motion at issue is Rivera's second successive postconviction motion. Moreover, as discussed below, the postconviction court below properly found that Rivera's successive postconviction motion was without merit. Rivera's jury unanimously recommended a sentence of death, and his case became final on September 22, 1990—well before *Ring*. The instant successive motion for postconviction relief is entirely based on Rivera's supposed entitlement to relief under *Hurst*. Because Rivera's conviction and sentence were final long

- 11 -

before *Ring* was issued, our precedent makes it clear that he is not entitled to any *Hurst* relief. *See, e.g.*, *Hitchcock*, 226 So. 3d at 217 ("We have consistently applied our decision in *Asay*, denying the retroactive application of *Hurst v. Florida* [136 S. Ct. 616 (2016)] as interpreted in *Hurst v. State* to defendants whose death sentences were final when the Supreme Court decided *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed. 2d 556 (2002)." (citing *Zack v. State*, 228 So. 3d 41 (Fla. 2017); *Marshall v. Jones*, 226 So. 3d 211 (Fla. 2017); *Lambrix v. State*, 217 So. 3d 977 (Fla. 2017); *Willacy v. Jones*, No. SC16-497, 2017 WL 1033679 (Fla. Mar. 17, 2017); *Bogle v. State*, 213 So. 3d 833 (Fla. 2017); *Gaskin v. State*, 218 So. 3d 399 (Fla. 2017))). Therefore, although *Huff* hearings are preferred on all postconviction motions, we conclude that the failure to hold a case management hearing in the instant proceeding was harmless. *See, e.g.*, *Groover*, 703 So. 2d at 1038. Thus, this claim of Rivera's successive motion for postconviction relief fails.

## II.

In his second claim, Rivera attempts to circumvent our decision on the retroactivity of *Hurst* by dubbing the death penalty statute as substantive, rather

than procedural. In doing so, Rivera cites to *Fiore*[4] and *In re Winship*[5] in support of his argument that *Hurst* relief should be applied retroactively because the substantive aggravators were present in the statute since its creation, thus warranting full retroactive application of *Hurst*. These arguments, however, are "nothing more than arguments that *Hurst v. State* should be applied retroactively to [Rivera's] sentence, which became final prior to *Ring*. As such, these arguments were rejected when [this Court] decided *Asay*." *Hitchcock*, 226 So. 3d at 217. Therefore, we conclude that this claim is meritless, based on our clear and repeated precedent on the retroactive application of *Hurst*.

As we recently explained in *Foster v. State*, No. SC18-860 (Fla. Dec. 13, 2018):

> [T]he *Hurst* penalty phase findings are not elements of the capital felony of first-degree murder. Rather, they are findings required of a jury: (1) *before* the court can impose the death penalty for first-degree murder, and (2) *only after* a conviction or adjudication of guilt for first-degree murder has occurred. Thus, Foster's jury did find all of the elements necessary to convict him of the capital felony of first-degree murder—during the guilt phase.
> In sum, a conviction for first-degree murder, a capital felony, solely consists of the jury having unanimously found the elements set forth in the substantive first-degree murder statute and the relevant jury instruction. The conviction for first-degree murder must occur before and independently of the penalty-phase findings required by *Hurst* and its related legislative enactments. The Florida Statutes

---

4. *Fiore v. White*, 531 U.S. 225 (2001).

5. *In re Winship*, 397 U.S. 358 (1970).

- 13 -

clearly establish the elements of first-degree murder required for a conviction, and *upon conviction*, the required findings in order to sentence a defendant to the death penalty. There is no, as Foster asserts, greater offense of "capital first-degree murder." Foster's guilt-phase jury considered all of the elements necessary to convict him of first-degree murder, a capital felony. Thus, his due process argument fails.

*Id.*, slip op. at 9-10. Our reasoning in *Foster* applies with equal force in Rivera's case. The jury unanimously convicted Rivera of first-degree murder during his guilt phase trial. *Rivera I*, 561 So. 2d at 537. This first-degree murder conviction is separate from the death penalty that may later be imposed after the penalty phase—albeit a necessary prerequisite to that imposition. *See* § 921.141(1), Fla. Stat. (2018). Therefore, we conclude, as we did in *Foster*, that Rivera's due process argument fails. *See Foster*, slip op. at 9-10.

Moreover, in *Asay*, we made it clear that *Hurst* would not be applied retroactively to death defendants whose cases became final before *Ring*. 210 So. 3d at 22. Similarly, in *Hitchcock*, we again made it clear that *Hurst* would not have retroactive application to defendants whose death sentences were final when the Supreme Court decided *Ring*. 226 So. 3d at 217 (citing *Zack*, 228 So. 3d 41; *Marshall*, 226 So. 3d 211; *Lambrix*, 217 So. 3d 977; *Willacy*, No. SC16-497, 2017 WL 1033679; *Bogle*, 213 So. 3d 833; *Gaskin*, 218 So. 3d 399). Because the crux of Rivera's argument is centered on this Court retroactively applying *Hurst* to Rivera's case, which became final in 1990, we conclude that this issue is meritless.

III.

Next, Rivera attempts to revive his previously extinguished claim of newly discovered evidence. This Court, in *Rivera V*, denied Rivera's claim of newly discovered DNA evidence relating to hair testing. 187 So. 3d at 840-41. Therefore, we conclude that this claim is procedurally barred. *Hendrix v. State*, 136 So. 3d 1122, 1125 (Fla. 2014) ("Claims raised and rejected in prior postconviction proceedings are procedurally barred from being relitigated in a successive motion." (citing *Van Poyck v. State*, 116 So. 3d 347, 362 (Fla. 2013))).

Nevertheless, even if this claim of Rivera's successive motion for postconviction relief is not procedurally barred, it is meritless. Rivera attempts to argue that the requirement under *Mosley v. State*, 209 So. 3d 1248 (Fla. 2016), that all post-*Hurst* death sentences be unanimously imposed mandates that we revisit his 2015 newly discovered evidence claim because of the increased likelihood that Rivera would receive a lower sentence on retrial in the post-*Hurst* landscape. This contention, however, ignores the substantive reasons we set forth in *Rivera V* for why Rivera's newly discovered evidence claim failed. Specifically, we stated:

> Rivera asserts that the newly discovered DNA evidence, together with all other evidence presented during trial and the postconviction proceedings, including Mark Peters's testimony that he was in possession of the van during the time Staci was abducted, establishes that Rivera did not commit the murder. We disagree. The DNA evidence simply confirms the possibility that was asserted during trial that the hair did not belong to Staci. Notably, the evidence is not exculpatory in nature, nor does it establish that Staci

- 15 -

was never in contact with Rivera or in Peters's van. Moreover, the State presented ample evidence during trial that Rivera committed the murder, including the testimony of two non-jailhouse witnesses to whom Rivera confessed. Starr Peck testified that Rivera admitted to killing Staci, and a second woman testified that Rivera told her that Staci was gone and would not be found. Additionally, the jury heard testimony that Rivera exposed himself to numerous girls between the ages of ten and twenty years old; he thought about forcing young girls to have sex with him; he admitted that he exposed himself to a girl on a bicycle; and he previously attacked a girl the same age as Staci. Thus, we conclude the newly discovered DNA evidence is not of such a nature that it would probably produce an acquittal on retrial, and we affirm the denial of this claim.

*Rivera V*, 187 So. 3d at 841 (footnote omitted); *see id.* (explaining that the limited value of hair comparisons was repeatedly emphasized by the State, the State's hair expert, and defense counsel at trial).[6] Thus, based on the extensive and significant evidence of guilt presented at trial, it is clear that Rivera's newly discovered evidence claim would not produce an acquittal on retrial, even in the post-*Hurst* legal landscape. *See, e.g.*, *Preston v. State*, 970 So. 2d 789 (Fla. 2007) (finding

------

6. Given the overwhelming evidence of guilt presented at trial, the postconviction court's order in *Rivera V* also explicitly detailed numerous reasons for the denial of Rivera's newly discovered evidence claim, due to the unlikely probability of receiving a lesser sentence on retrial: (1) The jury knew that the hair found near the victim's body did not belong to Rivera, making the additional hair testing results cumulative; (2) the jury heard testimony that Rivera used a different truck at the time of the murder than the van law enforcement knew about; and (3) the jury heard testimony about Rivera's confessions to Starr Peck, Angela Greene, and three inmates, and about his incriminating statements to law enforcement officers. Even in the post-*Hurst* death penalty scheme, we agree with the postconviction court in *Rivera V* that the DNA evidence does not create a reasonable doubt with respect to Rivera's guilt.

that newly discovered DNA evidence showing that hair recovered did not match the victim would probably not produce an acquittal on retrial because the case against the defendant was nevertheless a strong case).

IV.

Finally, Rivera asserts a bare-bones argument that seems to reiterate what was already asserted in Issue III—namely, that the alleged newly discovered exculpatory evidence demonstrates that the jury considered materially inaccurate evidence, which does not comport with Eighth Amendment requirements for the imposition of death. However, Rivera presents no legitimate or discernible argument within the limited analysis presented in his brief as to how his death sentence offends the Eighth Amendment. Instead, he seemingly asserts that this Court cannot deny Rivera's claims "simply because a case is old." Initial Br. 31. Therefore, as an initial matter, we conclude that this issue was insufficiently pled. *See Heath v. State*, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Vague and conclusory allegations on appeal are insufficient to warrant relief." (citing *Doorbal v. State*, 983 So. 2d 464, 482 (Fla. 2008))); *Victorino v. State*, 23 So. 3d 87, 103 (Fla. 2009) ("We have previously stated that '[t]he purpose of an appellate brief is to present arguments in support of the points on appeal.' " (quoting *Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990))).

Nevertheless, we also conclude that this claim fails on the merits. As mentioned above, Rivera attempts to argue that the need for reliable death sentences does not go away simply because a case was tried in 1986. This flawed logic, however, ignores the fact that we considered—and rejected—Rivera's claims of newly discovered evidence that were raised pursuant to evolving scientific capabilities with regard to hair sample testing. This consideration, and the ultimate result, indicate that the reliability of Rivera's death sentence was not so diminished as to raise Eighth Amendment concerns. Further, as explained in Issue III, we again conclude that the "materially inaccurate" information presented to the jury was not of such a nature that it would produce an acquittal on retrial or the imposition of a lesser sentence, in light of the distinct and overwhelming evidence of Rivera's guilt presented at trial—even post-*Hurst*. Therefore, we conclude that the jury's pre-*Ring*, unanimous recommendation of death is not unreliable or in violation of the Eighth Amendment, even in light of the limited testimony presented to the jury erroneously linking one hair sample recovered from the van to the victim.

## CONCLUSION

For the reasons set forth above, we affirm the postconviction court's denial of Rivera's successive motion for postconviction relief.

It is so ordered.

LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.
CANADY, C.J., and PARIENTE, J., concur in result.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED ON OR BEFORE DECEMBER 27, 2018. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE JANUARY 2, 2019. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Broward County,
        Paul L. Backman, Judge - Case No. 061986CF011716A88810

Neal Dupree, Capital Collateral Regional Counsel, Martin J. McClain, Special Assistant Capital Collateral Regional Counsel, and Nicole M. Noël, Assistant Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Ilana Mitzner, Assistant Attorney General, West Palm Beach, Florida,

        for Appellee